Bill C. NELSON II *v.* STATE of Arkansas

CR 74-26                                513 S.W. 2d 496

Opinion delivered September 16, 1974

*Sam Sexton, Jr.,* by: *Jim D. Spears,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *O. H. Hargraves,* Dep. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Bill C. Nelson II was convicted of slaying his wife, Virginia S. Nelson, the jury giving him life imprisonment for first degree murder. From such conviction, appellant brings this appeal. For reversal, six points are asserted, which we proceed to discuss, though not in the order set out by appellant.

It is contended that the court erred in overruling appellant's motion for a directed verdict as to the charge of first degree murder because of insufficiency of the evidence.

We do not agree. The evidence reflected that Nelson was estranged from his wife at the time of the shooting; that on the Thursday before the shooting (which occurred around midnight on Saturday), appellant called Laura Spaulding, a

friend of his wife, and asked if his wife had been seeing her first husband, stating, "if he saw them out together he would blow their heads off"; that on the next day, Nelson went to the apartment of Mrs. Spaulding, his wife being present, and though not getting into the apartment, argued with his wife from the outside, then left, after which Mrs. Nelson called the police. Nelson again returned to the apartment on Saturday afternoon, looking for his wife's ex-husband, went through various rooms, argued with his wife, and Mrs. Spaulding requested him to leave. The witness and Mrs. Nelson left the apartment to meet some friends, and upon returning around midnight, found Nelson crouched beside the fence with a rifle. He ordered them into the house. There, in the presence of seven other persons, appellant raised his gun, cocked it, and shot his wife to death. There was testimony that he remarked, "I came, I did what I intended to do" and left. There was also evidence, which will be more fully discussed in the next paragraph, to the effect that Nelson had taken out an insurance policy on his wife, to which she objected, about two weeks before the shooting. Of course, the evidence was sufficient to sustain the conviction, even without the testimony relating to insurance.

W. H. Weldon, manager of an insurance company, who was Nelson's last employer, testified that appellant had written a policy of life insurance on his wife in the amount of $10,000. Weldon said this was a "joint policy", both Nelson and his wife being the other's beneficiary. The witness said that a sales promotion campaign was in progress, with extra rewards to be given to salesmen who were successful during the campaign. Guy Morrow, a brother-in-law of Mrs. Nelson, testified that he was at the Nelson home when the insurance policy was discussed and that Mrs. Nelson did not seem pleased. He said that he overheard Nelson say "that if she didn't sign the policy, he was going to be very irritated and there would possibly be some family problems." Subsequently, he testified that Nelson "kind of laughed and said, 'Well, I just may kill her and collect the money myself.'"

Counsel for appellant argues that this testimony was not relevant in any way "other than upon some wild theory as to possible motive for murder." Counsel contends that the State's attorney did not offer this evidence in good faith, knowing that the policy was sold during a sales campaign

and that all the company salesmen were being encouraged to take out these policies. We do not agree with this statement. While it appears from the record that jealousy was the primary motive for the shooting, the fact remains that there can be more than one motive and the prosecuting attorney was justified in offering this evidence to the jury. After all, it is the function of that body to determine what facts are significant or not significant, and whether the fact under discussion had any bearing on the killing.

Appellant argues that the court erred in permitting jurors to ask questions of the witnesses. This happened about a half dozen times, and the judge was very careful to tell each witness not to answer until he had held the question to be proper. A detailed discussion of this point is unnecessary since in the case of *Ratton v. Busby,* 230 Ark. 667, 26 S.W. 2d 889, we held to the contrary, citing 58 Am. Jur. Witnesses, § 558 with approval to the effect that it is not error for a trial judge to give the jury permission to interrogate a witness without any special request from them so long as the questions asked are germane to the issue. In the case before us, as previously stated, the court was quite careful in determining that only proper questions were propounded and we see no abuse of discretion.

It is asserted that the court erred in permitting the prosecuting attorney to ask leading questions on re-direct examination. Six questions are listed, all of which, with the possible exception of one, we would not class as leading questions, but even if some of the questions could be considered in that category, we certainly can find no prejudice.

It is argued that on four occasions, the trial court erred in limiting defense counsel's cross-examination. Though we permit a full cross-examination of witnesses upon subjects mentioned in the examination in chief, we have held numerous times that the scope and extent of such examination are largely discretionary with the trial court. See *Bartley and Jones v. State,* 210 Ark. 1061, and cases cited therein. The first instance mentioned by appellant refers to several questions asked the witness relative to the expression on appellant's face when he shot his wife. The witness had already answered several times that she did not observe Nelson's face when he fired the shot and the court was merely

curtailing repetition. This was not an abuse of discretion. See *Vaughn* v. *State*, 252 Ark. 260, 478 S.W. 2d 759. While examining this witness, counsel also asked, "Mrs. Spaulding, is the reason you couldn't see his face, as you sit in the witness chair and you think about it, you know that at the time the shot was fired Bill Nelson had no awareness that the shot was being fired?" The court did not permit the question, stating to counsel that he was "testifying". As we said in *Woodruff Electric Coop.* v. *Daniel,* 251 Ark. 468, 472 S.W. 2d 919, "Even though the cross-examiner has the right to ask leading questions, this does not accord him the right to in effect testify by making statements."

The second instance mentioned by appellant refers to the cross-examination of Ronnie Bogard, a young man of teen-age, who was present in the room when the shot was fired. On the original cross-examination, Bogard was asked if there were changes in the way Nelson appeared insofar "as the look that he had." Bogard answered that he had the same look until just before he fired the shot when "he kind of got a mean look on his face, and then did it." The next question on cross-examination was, "Did he have a wild look in his eye?" Counsel never during the balance of the cross-examination referred to the statement by Bogard relative to the "mean look". The apparent purpose of the cross-examination of Bogard was to support the contention of insanity, and an extensive examination was conducted of the witness for that purpose.

The last question asked on cross-examination was, "Ronnie, can you describe for the jury what Bill Nelson looked like at the time of this shooting?", to which the witness replied, "I'd say about two seconds before and right after he had did it, he looked like he went into some kind of a trance, like his mind went blank or something." Counsel then stated, "No further questions." On re-direct, when asked to describe the physical features of Nelson, Bogard again mentioned that appellant looked "mean". On re-cross, several questions were asked about the expressions "mean", "trance", and "blank". The court finally halted this examination, and we certainly find no abuse of discretion. In the first place, it appears that the subject was fully covered and the witness's answers were only a reiteration of earlier testimony. In the next place, the "mean" expression was used by the witness in

his original cross-examination and no further questions asked. Likewise, the "trance" expression was used by the witness in the original cross-examination and no further questions asked. As pointed out in 98 C.J.S. Witnesses, § 429, p. 237:

"As a general rule, recross-examination is not allowable as a matter of right; the question of permitting recross-examination, and the scope and extent thereof, are in the sound discretion of the trial court, whose action will not be disturbed unless an abuse of discretion is shown."

The next instance mentioned by appellant as to curtailment of cross-examination relates to a question asked as follows:

"Q. Mr. Carruth, did he, Mr. Cowan, advise you that it appeared to him that Mr. Nelson did not know that the shot was fired at the time it was fired, and that he was shocked after discovering that Mrs. Nelson had been shot?"

The court sustained an objection, holding that the evidence was hearsay. Counsel for appellant agrees that such testimony was hearsay but contends that it was admissible as part of the *res gestae*. Cowan was one of the people present when the shooting occurred and Carruth was the first police officer to arrive. This officer questioned the various witnesses to the shooting and this was the basis of the question asked him by counsel. We agree with the State that Cowan's statement was not a part of the *res gestae*. For one thing, though it is indefinite as to when Carruth arrived and the statement was made, it is certain, as pointed out by the State, that if such a remark were made, it was not earlier than five to ten minutes after the shooting occurred and probably much later. In *Liberty Cash Growers, Inc.* v. *Clements,* 193 Ark. 808, 102 S.W. 2d 836, we held that remarks made by a truck driver in an action to recover damages for negligence were not a part of the *res gestae* when the remarks were made five minutes after the accident, this court stating that the remarks constituted what the witness said about the act, rather than the act speaking for itself. The statement by Cowan was simply a response to

questions from the officer and constituted only a narrative of a past occurrence. Cowan had testified during cross-examination that he had "okayed" a written statement by his wife which included a comment that Nelson had looked shocked that he had shot Mrs. Nelson. Cowan, when asked if he was agreeing that Nelson looked shocked replied, "No, not really. I just don't really know what he looked like." However, the questioning of Carruth was not for the purpose of testing Cowan's credibility, and, in fact, the court mentioned that if counsel subsequently ascertained that Cowan had made statements to Carruth different from his (Cowan's) testimony, Carruth could be placed back on the stand by appellant for the purpose of showing that fact. At any rate, we hold that this statement was not a part of the *res gestae*, and was therefore inadmissible as hearsay evidence.

The last contention of improper limitation on cross-examination refers to a question asked Officer Harvey of the Fort Smith Police Department as to whether it was "a matter of common knowledge in the police department that Bill Nelson was undergoing psychiatric care." Nelson was a former police officer, and of course the other officers were acquainted with him. Harvey answered that he had "heard statements to that effect", but had no personal knowledge of that fact. He was then asked:

"Q. Let me ask you this. Did anybody ever say to the Chief or Assistant Chief, 'look, here's a man who's under psychiatric care. Is this what we really need on the Police Department?' "

An answer to this question would have been inadmissible for more than one reason, and certainly was not proper recross-examination since it did not relate to anything asked on redirect examination.[1]

Finally, it is asserted that the court erred in refusing to permit medical librarians to read from medical records which had been offered into evidence by appellant. These records

[1]Harvey had originally testified that he had overheard an argument between Mr. and Mrs. Nelson at their former apartment. On re-direct examination, two questions were asked, first, the date that Harvey visited the apartment, and second, if this occurred before Nelson "went into the hospital." Appellant contends that the reference to "hospital" permitted the question herein under discussion.

were offered as a matter of furthering the defense of insanity and appellant desired that the hospital employees read *inter alia* the dates of several brain concussions suffered by appellant, medication prescribed, final diagnosis, and summary of the hospitalizations. The records were properly offered under the provisions of Ark. Stat. Ann. § 28-928—929 (Repl. 1962), but this fact in itself does not necessarily mean that all the contents of such records were relevant or competent. In *Royal Service* v. *Whitehead Construction Co.*, 254 Ark. 234, 492 S.W. 2d 423, we stated that though certain business records may be admissible in evidence under the provisions of the statute just mentioned, said statute does not make such evidence either material or relevant. Appellant achieved his purpose in offering these records, for the matters heretofore mentioned, with the permission of the court, were not only fully discussed by Mr. and Mrs. Nelson, parents of appellant, but by both the psychiatrist who testified for the defense, and the psychiatrist who testified for the State. The several concussions and circumstances surrounding were related to the jury in detail, and we cannot say that the mere reading of such records by non-experts would have added anything of value to the evidence. Even if the ruling of the court had been erroneous, no possible prejudice could have resulted.

A reading of the record clearly reflects that the trial court carefully tried this case, rendered the rulings complained of only after studied thought, and conducted the proceedings with thorough competence and impartiality.

Affirmed.