United States Court of Appeals,

Eleventh Circuit.

No. 95-3029.

UNITED STATES of America, Plaintiff-Appellee,

v.

Henry FRANCIS, Jacqueline Dennis, Defendants-Appellants.

Dec. 30, 1997.

Appeals from the United States District Court for the Middle District of Florida. (No. 93-304-CR-T-23B), Steven D. Merryday, Judge.

Before DUBINA, Circuit Judge, and HILL and GIBSON[*], Senior Circuit Judges.

JOHN R. GIBSON, Senior Circuit Judge:

Henry Francis and Jacqueline Dennis appeal their convictions of conspiring to murder a federal official engaged in and on account of the performance of his official duty, in violation of 18 U.S.C. §§ 1114 and 1117 (1994), and six counts of using interstate and foreign commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958 (1994). Francis also appeals his conviction of solicitation to commit a crime of violence, in violation of 18 U.S.C. §§ 373 and 2 (1994). Francis argues that he was entrapped as a matter of law and that the district court misapplied the sentencing guidelines. Francis and Dennis both argue that the district court[1] erred in allowing the government to introduce summaries of wiretapped telephone conversations. Dennis also argues that the district court erred in refusing to grant her a severance. We affirm.

---

[*]Honorable John R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]The Honorable Steven D. Merryday, United States District Judge for the Middle District of Florida.

On May 10, 1993, Francis and Rendiff Green were arrested for selling crack cocaine. Shortly thereafter, Green and another inmate began making arrangements to have a Jamaican Obeah priest put a voodoo curse on Ernest Hardy, the informant to whom Green and Francis sold crack. Francis joined the voodoo plot.

In June of 1993, Green began cooperating with government agents. On August 31, 1993, Green informed the F.B.I. that Francis had told him that Francis had contacted a Jamaican named "Mauler" to kill Assistant United States Attorney Kevin Darken, Task Force Agent Larry Bahnsen, and Hardy, but he had unsuccessfully tried to call in debts to finance the killings. On September 8, 1993, Green informed the F.B.I. that Francis said he had recruited some friends in Jamaica to perform the assassinations because they were "cheaper" and more "loyal" than Mauler. In addition, Francis wanted Green to help him obtain false passports for the Jamaicans. Francis also asked Green to take pictures of Kevin Darken if Green were released on bond.

Based on this information, the F.B.I. obtained a warrant to intercept Francis's telephone conversations originating from his cell block. Meanwhile, Green agreed to tell Francis that he had a Jamaican contact who could obtain false passports. Green gave Francis the telephone number of Miami detective Richard Archie, telling Francis that Archie had provided Green with false documents in the past.

On September 29, 1993, Francis contacted Archie. Over the next two months, Francis and Archie had approximately twenty telephone conversations.

Initially, Archie agreed to provide four passports to Francis at $500 each. Francis asked Green to pay for two of the passports, and Green agreed. After a few conversations with Francis, Archie expanded his role and offered to assist Francis in ways other than providing false passports. In the course of a long conversation, Archie made the following statements to Francis, "[W]hen the

brethren come up, will they need anything?"; "Whatever you want, me can hook up."; "[M]e know if your brethren come up, they are going to need some things....  Tool and all those sort of things, you know?"; "[M]e have a whole heap of tools[2] and things."

Francis replied, "Right, we will need all those things ... They are coming to do certain things for me."  Later in the conversation, Archie stated, "[M]e brought up some brethren ... (a)bout two months ago ... Those boys took care of thing and they went back down."  Francis replied, "Me want to deal with something like that....  But me only vex because me in here."  Archie asked, "Some little local boys, up there in Tampa?"  Francis answered, "Yeah man, it's them man."  Archie replied, "You should have told me, man, and me would have helped you out already....  All of those boys don't have to come way up here for that....  They don't have to come up to do that....  [M]e have some youths who can take care of a whole heap of things like that."  Francis replied, "Alright."

A week later, after the Jamaicans delayed in sending Archie photographs necessary for Archie to prepare the passports, Francis stated, "[M]e have to get with them and see what they are dealing with....  If they are joking around, me will have to make you take care of certain things for me....  Me will call up the youth, and find out if they are just joking around, and then me can know what to tell you, see?"

Four days later, after Archie told Francis that he had still not received the photographs from the Jamaicans, Francis told Archie, "You probably have to come up here and deal with a thing."

In a later conversation, Archie and Francis discussed how Francis would have Jacqueline Dennis furnish Archie with an "address."  Francis asked Archie, "You will go on the scene?"  Archie replied, "Yeah man....  But we have to work out the tax part."  Francis then stated, "Me don't know

---

[2]Detective Archie testified that, in this conversation, "tools" is Jamaican patois for guns or firearms.

how much because me much you are going to want for that." Archie replied, "[M]e don't want you to include my boy Renny part inside that, y'know?....   Because that is taking care of a totally different business." Francis replied, "Me know, me know." Archie then stated, "The five piece that you are going to send? Send that for the other part of this thing here.... And when its done, me will tax you for the rest." Francis responded, "Alright boss.... Me will send that off in this week, about Monday.... Or, or you, you want me to wait until you get those things before me send it?" Archie responded, "No man, that thing is going to take care of a totally different thing, you know?" Francis then stated, "That's why me say me will send that off about Monday, Man." To which Archie replied, "Alright, and when my man done, when me done with the plumbing part ... me will let you know.... And then me tax you." Francis responded, "Yeah."

Later, Francis sent Archie $500.  In addition, Dennis telephoned Archie with addresses and telephone numbers for Bahnsen and Darken.

## I.

Francis argues that his conviction must be reversed because he was entrapped as a matter of law.  Specifically, Francis argues the government presented insufficient evidence to prove that he was predisposed to commit murder.

A valid entrapment defense requires two elements:  (1) government inducement of the crime, and (2) defendant's lack of predisposition to commit the crime prior to the inducement.  *See United States v. Brown,* 43 F.3d 618, 623 (11th Cir.1995) (citing *Mathews v. United States,* 485 U.S. 58, 61, 108 S.Ct. 883, 885-86, 99 L.Ed.2d 54 (1988)).  Once the defendant has produced evidence of inducement, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime absent the government's role in assisting such commission.  *Id.* at 623-24.

Predisposition is a fact intensive inquiry into the defendant's readiness and willingness to engage in the crime absent any contact with the government's officers or agents. *Id.* at 624-25. The government may not implant in an innocent person's mind the disposition to commit a crime, and then induce the person to commit the crime so it may prosecute. *See Jacobson v. United States,* 503 U.S. 540, 548, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992) (citing *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 212-13, 77 L.Ed. 413 (1932)).

The jury rejected Francis's claim that he was entrapped. When a jury rejects an entrapment defense, our review is limited to determining whether the government presented sufficient evidence for a reasonable jury to conclude that the defendant was predisposed to take part in the crime. *See Brown,* 43 F.3d at 622. Review is de novo, but we view all evidence and make all inferences in favor of the government. *Id.* Furthermore, we cannot overturn the jury's verdict if any reasonable construction of the evidence would allow the jury to find the defendant guilty beyond a reasonable doubt. *Id.*

After thorough study of the record, we conclude the evidence, viewed in the light most favorable to the government, was sufficient for a reasonable jury to find that Francis was ready and willing to commit the crime absent any contact with the government. Green testified that Francis first raised the topic of murdering Bahnsen, Darken, and Hardy and had attempted to hire Mauler to perform the assassinations. Green also testified that Francis, before being introduced to Archie, communicated with the Jamaicans about performing the murders, asked Green to get passports for his Jamaican associates, and asked Green to take pictures of one of the intended targets if Green were released on bond.

The evidence supports the conclusion that the government did not implant in Francis's mind the disposition to murder Bahnsen, Darken, and Hardy. Although Green and Archie assisted

Francis, and Archie offered his services as an assassin, the government did not initiate the assassination plot. Rather, the government merely provided Francis with a method of accomplishing the crime. "[T]he fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Jacobson,* 503 U.S. at 548, 112 S.Ct. at 1540 (quoting *Sorrells,* 287 U.S. at 441, 53 S.Ct. at 212). We reject Francis's entrapment argument.

II.

Francis also makes two arguments related to his sentence. First, Francis argues that the district court clearly erred in finding that Francis offered "something of pecuniary value" in exchange for murder, resulting in a four level enhancement of his offense level pursuant to U.S.S.G. § 2A1.5(b)(1) (1997). Second, Francis argues that the district court clearly erred in finding that there were two intended victims of the conspiracy plot. Francis claims that the evidence supports a finding that Bahnsen, and not Darken, was the only intended victim. Therefore, Francis claims that he should not have been sentenced on the basis of two grouped counts resulting in a two level enhancement pursuant to U.S.S.G. §§ 1B1.2 and 3D1.4 (1997).[3]

In sentencing, we review the district court's factual findings for clear error, and its application of those facts to the Sentencing Guidelines de novo. *See United States v. Shenberg,* 89 F.3d 1461, 1473 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997). The government must prove the facts used in sentencing by a preponderance of the evidence. *Id.*

---

[3]Section 1B1.2(d) states, "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Section 3D1.4 provides that the offense level should be increased based on the number of "separate" conspiracies or "units."

at 1476.

Francis sent Detective Archie $500 and Archie testified that, based on his telephone conversations with Francis outlined above, he understood the $500 to be a down payment from Francis for Archie to commit the murders. After reviewing the conversations and Archie's testimony, we conclude the district court did not clearly err in finding that Francis offered something of pecuniary value in exchange for murder.

Similarly, ample evidence exists to support the district court's finding that Francis intended to kill both Bahnsen and Darken. Green testified that Francis repeatedly spoke to Green about killing both Bahnsen and Darken. In addition, Archie testified that, based on his conversations with Francis and Dennis, Francis wanted both Bahnsen and Darken killed. Furthermore, Darken's wife testified that she received a telephone call from a person threatening to kill Darken. And finally, Dennis, at Francis's direction, conveyed information to Archie about both Darken and Bahnsen. The district court did not clearly err in finding that there were two intended victims of the conspiracy.

III.

Francis and Dennis both argue that the district court erred in allowing the government to introduce summaries of the wiretapped telephone conversations. We review the district court's admission of summaries for an abuse of discretion. *See United States v. Massey,* 89 F.3d 1433, 1440 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 983, 136 L.Ed.2d 865 (1997).

Because Francis conducted his conversations in Jamaican patois,[4] the government had FBI Agent Wilfred Rattigan prepare translated transcripts of the tape recorded conversations. From the translations, Rattigan prepared summaries of the taped conversations.

---

[4]According to Agent Wilfred Rattigan, Jamaican patois is approximately eighty percent English, but also contains West African, Portuguese, French and Spanish words, with the words arranged in a different order than in standard English.

At trial, the district court accepted Agent Rattigan as an expert in Jamaican patois and allowed Rattigan to testify concerning the contents of the intercepted conversations. In general, when testifying about a particular conversation, the government would first admit Rattigan's prepared summary of the conversation, which would be displayed as an exhibit before the jury. Rattigan would then read to the jury his prepared summary. Next, the court would admit the exhibit containing the translated transcript of the intercepted telephone conversation, and then play the tape for the jury. The court admitted and made available to the jury all taped conversations, although some summaries and transcripts were introduced without playing the accompanying tape.

Appellants first argue that the district court erred in admitting summaries of the translated conversations in lieu of playing all the taped conversations for the jury. We reject this argument.

Rule 1006 of the Federal Rules of Evidence specifically provides that the contents of voluminous recordings which cannot conveniently be examined in court may be presented in the form of a summary. Fed.R.Evid. 1006. Rule 1006 allows the district court to admit the summaries as evidence where, in the court's discretion, it would be inconvenient or unnecessarily time-consuming to play every taped conversation for the jury. *See United States v. Clements,* 588 F.2d 1030, 1039 (5th Cir.1979);[5] *United States v. Smyth,* 556 F.2d 1179, 1184 (5th Cir.1977). To prevent the necessity of playing all seventy-six conversations in their entirety, the court exercised its discretion and admitted the summaries into evidence. This was not an abuse of discretion.

Appellants also argue that the summaries were argumentative and arranged to further the prosecution's position, thus prejudicing appellants' case.

First, we observe that neither Francis nor Dennis, whose briefs are worded identically on

---

[5]Decisions of the Fifth Circuit rendered prior to October 1, 1981, are binding precedent in the Eleventh Circuit until overruled by the Eleventh Circuit sitting en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

this point, directed the court to any specific argumentative summaries. This is in clear violation of F.R.A.P. 28(a)(4), and 28(e). The burden of proof is on the appellant, and this court is not required to search the forty-volume transcript and numerous exhibits for error. *See United States v. Lynn,* 608 F.2d 132, 135 (5th Cir.1979).

Nevertheless, we recognize the potential prejudice of undue editorializing when the government prepares summaries from translations of tape recordings. Therefore, despite the lack of guidance from appellants, we have compared a number of the government prepared summaries with the transcripts of the tape recordings and conclude that the ones examined are neither argumentative nor unfair.

Some of the summaries are likely based on assumptions favorable to the government. These assumptions are allowed "so long as supporting evidence has been presented previously to the jury ... and where the court has "made it clear that the ultimate decision should be made by the jury as to what weight should be given to the evidence.' " *United States v. Means,* 695 F.2d 811, 817 (5th Cir.1983) (citing *United States v. Diez,* 515 F.2d 892, 905 (5th Cir.1975), and quoting *United States v. Andrew,* 606 F.2d 549, 550 (5th Cir.1979)). *See also Myers v. United States,* 356 F.2d 469 (5th Cir.1966) (government not obligated to include the appellant's version of the facts in its summary exhibit); *Massey,* 89 F.3d at 1441, n. 9 (Rule 1006 does not require the fact finder to accept the information presented in the summaries as true). Here, supporting evidence, such as Green's testimony, Archie's testimony, and the actual taped conversations were before the jury.

In addition, the district court repeatedly instructed the jury that the summaries were the government's contentions of the contents of the tapes and that the jury was the ultimate judge of the accuracy of the summaries. When admitting the summaries, the court instructed the jury that they were prepared by Agent Rattigan, that the actual recordings were in evidence and available to the

jury, and that the recordings were the primary and governing evidence of the contents of the conversations. The court further explained that the summaries were intended to help explain or summarize, or at least speed along, the explanation of the contents of the tapes, and were for the jury's convenience. The court instructed the jury that the court neither accepted nor rejected the summaries and that the summaries did not represent the court's conclusion about the content of the tapes. The court emphasized that if the summaries in any way did not accurately reflect the contents of the conversations, the jury should disregard them. The court repeated these instructions on numerous occasions during the presentation of evidence. These cautionary instructions limited any possible prejudice to appellants from the summaries.

Furthermore, any possible prejudice was neutralized by appellants' extensive cross-examination of Agent Rattigan concerning his knowledge of Jamaican patois and his meaning and preparation of the summaries. In addition, Francis testified as to his interpretation of the taped conversations. Under these circumstances, we conclude the court did not abuse its discretion in admitting the government-prepared summaries into evidence.

IV.

Dennis argues that the district court erred by denying her motion to sever her trial. Dennis argues that she was severely prejudiced by the government's presentation of Francis's prior drug activity and because the evidence against her was small as compared to Francis.

We have consistently held that persons who are charged together as co-conspirators should be tried together. *See United States v. Knowles,* 66 F.3d 1146, 1158 (11th Cir.1995). In considering a motion to sever, the district court must determine whether the prejudice inherent in a joint trial outweighs the public's interest in judicial economy. *See United States v. Saget,* 991 F.2d 702, 707 (11th Cir.1993).

To establish that the district court abused its discretion in refusing to sever, the defendant must demonstrate that the joint trial resulted in specific and compelling prejudice to her defense. *Id.* This is done by showing that the jury was unable to make an individualized guilt determination for each defendant. *Id.* "This is a heavy burden, and one which mere conclusory allegations cannot carry." *United States v. Hogan,* 986 F.2d 1364, 1375 (11th Cir.1993). In addition, "cautionary instructions to the jury to consider the evidence separately are presumed to guard adequately against prejudice." *United States v. Gonzalez,* 940 F.2d 1413, 1428 (11th Cir.1991).

Dennis has offered only conclusory allegations of compelling prejudice. She has not demonstrated how the government's presentation of evidence concerning Francis's prior drug activities affected the jury's ability to make an individualized determination of her guilt. Furthermore, compelling prejudice does not exist merely because much of the evidence at trial applies only to a co-defendant. *United States v. Smith,* 918 F.2d 1501, 1510 (11th Cir.1990). The district court minimized any possible prejudice by instructing the jury to consider the evidence against Francis and Dennis separately. The district court did not abuse its discretion in denying Dennis's severance motion.

V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.