UNITED STATES of America, Plaintiff-Appellee,

v.

Phyllis RICHARDSON, Defendant-Appellant.

No. 99-11126.

United States Court of Appeals,

Eleventh Circuit.

Nov. 3, 2000.

Appeal from the United States District Court for the Southern District of Florida. (No. 97-08124-CR-DTKH), Daniel T.K. Hurley, Judge.

Before BARKETT, WILSON and MAGILL[*], Circuit Judges.

BARKETT, Circuit Judge:

Phyllis Richardson appeals her conviction for embezzlement, money laundering, and mail fraud. The Indictment against Richardson consisted of forty-one counts which included sixteen counts of embezzlement of funds of a federally insured financial institution, in violation of 18 U.S.C. § 657; nine counts of mail fraud, in violation of 18 U.S.C. § 1341; fifteen counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and one count of engaging in a monetary transaction involving funds of a value greater than $10,000 embezzled from a financial institution, in violation of 18 U.S.C. § 1957. Factually, the Indictment was based upon allegations that between 1986 and 1996, Richardson, while employed at Community Savings Bank, embezzled approximately $870,000 from at least fourteen bank customers and laundered those funds in her own accounts.

After a jury trial, Richardson was found guilty on thirty-eight counts[1] and was sentenced to 120 months imprisonment and three years supervised release. The district court also ordered Richardson to pay restitution of $1,215,605.81 and a special assessment of $2,500. On appeal, Richardson argues that three errors by the district court require reversal of her conviction: 1) the district court erred by allowing jurors to submit written questions through the court to witnesses, thereby denying her a fair trial; 2) the district court erred in instructing the jury on the law relating to power of attorney; and 3) the district court erred by

---

[*]Honorable Frank J. Magill, U.S. Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

[1]During the trial the government abandoned two counts of embezzlement and one count of mail fraud.

admitting into evidence summary exhibits with a column heading labeled "unauthorized activity" when whether that activity was in fact "unauthorized" was a jury issue. We address each of Richardson's contentions in turn.

*A. Jury Questioning*

At the outset of Richardson's trial, the district court instructed the jury that if they did not understand a part of a witness's testimony they could submit written questions to the court after the lawyers ended the examination of that witness. The court explained to the jurors that some of their submitted questions might not be asked because the question might be improper under the rules of evidence and instructed them not to speculate on what the answer to such questions might be or why the court did not ask a particular question. Richardson did not object to this practice at the time.

Throughout the trial, in accordance with the judge's instructions, jurors occasionally submitted one or more questions for a witness. Upon receipt, the district court would review the questions with the lawyers at sidebar in order to hear, discuss and rule on objections, and then address those questions that were permitted to the witness. At mid-trial, Richardson objected to any future questions by the jury, arguing that the questions demonstrated that the jurors were becoming adversarial and engaging in premature deliberation. The district court disagreed with both of Richardson's contentions and overruled her objection. The court, however, again instructed the jury, explaining that they were allowed to ask questions only for the purpose of clarifying a witness's testimony; that jurors should not become advocates for either side; and that they must decide the case after they retired to the jury room based only the evidence presented to them in court.

During the course of the six-week trial, the court asked witnesses twenty-three sets of questions that had been submitted by the jury. Prior to Richardson's objection, the court had addressed questions to five witnesses based on ten sets of questions submitted by jurors. Following Richardson's objection, jurors submitted thirteen sets of questions to the court, twelve of which were addressed to two witnesses. Most of these questions came during the government's case-in-chief, and the jurors did not ask any questions of Richardson. On appeal, Richardson first argues that permitting jurors to ask any questions at all deprived her of her constitutional right to a fair trial. Alternatively, Richardson argues that at least ten of the questions—all asked after her objection—were specifically prejudicial to her.

Because Richardson did not object to the practice of jury questioning until mid-trial, two standards of review apply. Questions submitted prior to Richardson's objection are reviewed for plain error, *see United States v. Olano,* 507 U.S. 725, 732-36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), while questions submitted

after Richardson's objection are reviewed for abuse of discretion. *See United States v. Johnson,* 914 F.2d 136, 138 (8th Cir.1990). "Plain error, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of judicial proceedings." *United States v. Walther,* 867 F.2d 1334, 1343-44 (11th Cir.1989). Thus, in order to establish plain error, Richardson must demonstrate prejudice—that is, she must demonstrate that the error affected the outcome of the district court proceedings. *See Olano,* 507 U.S. at 734, 113 S.Ct. 1770.

As an initial matter, under either standard, we reject outright Richardson's argument that permitting juror questioning of witnesses is per se error. Indeed, every circuit to consider the practice has permitted it, holding that the decision to allow juror questioning rests within the discretion of the trial judge. *See United States v. Collins,* 226 F.3d 457 (6th Cir.2000); *United States v. Hernandez,* 176 F.3d 719, 724 (3d Cir.1999); *United States v. Feinberg,* 89 F.3d 333, 336 (7th Cir.1996); *United States v. Bush,* 47 F.3d 511, 515 (2d Cir.1995); *United States v. Cassiere,* 4 F.3d 1006, 1017-18 (1st Cir.1993); *United States v. Groene,* 998 F.2d 604, 606 (8th Cir.1993) ("The use of the procedure itself is not plain error (prejudicial per se)."); *United States v. Polowichak,* 783 F.2d 410, 413 (4th Cir.1986); *United States v. Callahan,* 588 F.2d 1078, 1086 (5th Cir.1979) ("There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses.").[2] In addition, virtually every state court to consider the issue has permitted jurors to ask questions of witnesses,[3] and the legislatures of Arizona and Florida have enacted statutes specifically

---

[2]In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[3]Alabama: *Prather v. Nashville Bridge Co.,* 286 Ala. 3, 236 So.2d 322 (Ala.1970). Arizona: *Superior & Pittsburg Copper Co. v. Tomich,* 19 Ariz. 182, 165 P. 1101 (Ariz.1917), *aff'd,* 250 U.S. 400, 39 S.Ct. 553, 63 L.Ed. 1058 (1919), *rev'd on other grounds,* 22 Ariz. 543, 199 P. 132 (Ariz.1921). Arkansas: *Nelson v. State,* 257 Ark. 1, 513 S.W.2d 496 (Ark.1974). California: *People v. McAlister,* 167 Cal.App.3d 633, 213 Cal.Rptr. 271 (1985). Connecticut: *Gurliacci v. Mayer,* 218 Conn. 531, 590 A.2d 914 (Conn.1991). Florida: *Bradford v. State,* 722 So.2d 858 (Fla.App.1998). Illinois: *Chicago Hansom Cab Co. v. Havelick,* 131 Ill. 179, 22 N.E. 797 (Ill.1889); *Chicago, Milwaukee & St. Paul Ry. v. Harper,* 128 Ill. 384, 21 N.E. 561 (Ill.1889). Indiana: *Carter v. State,* 250 Ind. 13, 234 N.E.2d 650 (Ind.1968). Iowa: *Rudolph v. Iowa Methodist Medical Center,* 293 N.W.2d 550 (Iowa 1980). Kansas: *State v. Hays,* 256 Kan. 48, 883 P.2d 1093 (Kan.1994). Kentucky: *Slaughter v. Commonwealth,* 744 S.W.2d 407 (Ky.1987), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036, *reh'g denied,* 492 U.S. 932, 110 S.Ct. 11, 106 L.Ed.2d 626 (1989); *Big Sandy & Cumberland Ry. v. Thacker,* 270 Ky. 404, 109 S.W.2d 820 (Ky.1937). Massachusetts: *Commonwealth v. Urena,* 417 Mass. 692, 632 N.E.2d 1200 (Mass.1994). Michigan: *People v. Heard,* 388 Mich. 182, 200 N.W.2d 73 (Mich.1972); Minnesota: *State v. Crawford,* 96 Minn. 95, 104 N.W. 822 (Minn.1905). Missouri: *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852 (Mo.1993); *Schaefer v. St. Louis & S. Ry.,* 128 Mo. 64, 30 S.W. 331 (Mo.1895); New Jersey: *State v. Jumpp,* 261 N.J.Super. 514, 619 A.2d 602 (N.J.Super.Ct.App.Div.1993); New Mexico: *State v. Rodriguez,* 107 N.M. 611, 762 P.2d 898 (N.M.Ct.App.), *cert. denied,* 107 N.M. 546,

mandating the practice.  Ariz. R. Ct. 39(b)(10);  Fla. Stat. ch. 40.50(3).

In American jurisprudence, a jury serves to "assure a fair and equitable resolution of factual issues." *Standard Oil Co. of Cal. v. Arizona,* 738 F.2d 1021, 1031 (9th Cir.1984) (quoting *Colgrove v. Battin,* 413 U.S. 149, 157, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973)).  In order to discharge this duty, it is incumbent upon jurors to listen to the evidence, taking care to understand it so that the facts can be determined and then applied to the relevant law.  The underlying rationale for the practice of permitting jurors to ask questions is that it helps jurors clarify and understand factual issues, especially in complex or lengthy trials that involve expert witness testimony or financial or technical evidence.  If there is confusion in a juror's mind about factual testimony, "it makes good common sense to allow a question to be asked about it."  *Callahan,* 588 F.2d at 1086.  "Juror-inspired questions may serve to advance the search for truth by alleviating uncertainties in the jurors' minds, clearing up confusion, or alerting the attorneys to points that bear further elaboration." *United States v. Sutton,* 970 F.2d 1001, 1005 n. 3 (1st Cir.1992).  Indeed "[t]here may be cases ... in which the facts are so complicated that jurors should be allowed to ask questions in order to perform their duties as fact-finders." *Feinberg,* 89 F.3d at 337;  *see Sutton,* 970 F.2d at 1006 ("Because this was a factually complex case in which a greater-than-average risk of jury confusion existed, the positive value of allowing juror-inspired questioning was relatively high.").  Moreover, juror questioning leads to more attentive jurors and thereby leads to a more informed verdict.  *See* Larry Heuer & Steven Penrod, *Increasing Juror Participation in Trials:  A Field Experiment with Jury Notetaking and Question Asking,* 12 Law. & Hum. Behav. 231, 233-34 (1988) (addressing benefits of juror questioning);  *see also, Sutton,* 970 F.2d at 1005, n. 3. ("[I]t is at least arguable that a question-asking juror will be a more attentive juror.").

At the same time, in conjunction with the practice's near unanimous acceptance, courts have cautioned district courts about the possible danger of juror questioning.  In particular, courts have expressed concern that juror questioning risks distorting the adversarial process by "turning jurors into advocates,

761 P.2d 424 (N.M.1988).  New York:  *People v. Wilds,* 141 A.D.2d 395, 529 N.Y.S.2d 325, (1988); *People v. Knapper,* 230 A.D. 487, 245 N.Y.S. 245 (1930).  North Carolina:  *State v. Howard,* 320 N.C. 718, 360 S.E.2d 790 (N.C.1987);  *State v. Kendall,* 143 N.C. 659, 57 S.E. 340 (N.C.1907).  Ohio:  *State v. Sheppard,* 100 Ohio App. 345, 128 N.E.2d 471 (Ohio Ct.App.1955), *aff'd,* 165 Ohio St. 293, 135 N.E.2d 340 (Ohio), *cert. denied,* 352 U.S. 910, 77 S.Ct. 118, 1 L.Ed.2d 119, *reh'g denied,* 352 U.S. 955, 77 S.Ct. 323, 1 L.Ed.2d 245 (1956).  Oklahoma:  *White v. Little,* 131 Okla. 132, 268 P. 221 (Okla.1928): Pennsylvania:  *Boggs v. Jewell Tea Co.,* 266 Pa. 428, 109 A. 666 (Pa.1920).  South Carolina:  *State v. Bradford,* 87 S.C. 546, 70 S.E. 308 (S.C.1911).  Tennessee:  *State v. Jeffries,* 644 S.W.2d 432 (Tenn.Crim.App.1982).  Utah:  *State v. Anderson,* 108 Utah 130, 158 P.2d 127 (Utah 1945).  Virginia: *Williams v. Commonwealth,* 24 Va.App. 577, 484 S.E.2d 153 (Va.Ct.App.1997).  District of Columbia: *Yeager v. Greene,* 502 A.2d 980 (D.C.1985).

[thereby] compromising their neutrality." *Bush,* 47 F.3d at 515; *United States v. Johnson,* 892 F.2d 707, 713 (8th Cir.1989) (Lay, C.J., concurring) ("The fundamental problem with juror questions lies in the gross distortion of the adversary system and the misconception of the role of the jury."). Courts have also expressed concern that juror questioning may be "a subliminal invitation to launch prematurely into evaluating the evidence." *Bush,* 47 F.3d at 515 (citing *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 517 (4th Cir.1985)). Moreover, courts have noted that the practice can "impale attorneys on the horns of a dilemma" when confronted by an improper juror question. *Bush,* 47 F.3d at 515-16. In such a situation, attorneys are faced with the prospect of either "objecting to questions proffered by the arbiters that [they] are attempting to influence" and risk alienating the jury, or foregoing objections and waiving all but the most egregious errors. *Feinberg,* 89 F.3d at 336-37.

Thus, to guard against abuses of discretion, district courts have been directed to employ measures that will protect against these risks. For example, in determining whether to permit juror questioning, the trial court should "weigh the potential benefit to the jurors against the potential harm to the parties, especially when one of those parties is a criminal defendant." *Feinberg,* 89 F.3d at 333; *see Callahan,* 588 F.2d at 1086 n. 2 ("District courts must in each case balance the positive value of allowing a troubled juror to ask a question against the possible abuses that might occur if juror questioning became extensive."). Questions should be permitted to clarify factual issues when necessary, especially in complex cases. However, the questioning procedure should not be used to test legal theories, to fill in perceived gaps in the case, or occur so repeatedly that they usurp the function of lawyer or judge, or go beyond the juror's role as fact finders. Care should be taken that the procedure utilized is fair, and permits all the parties to exercise their rights. To this end, jurors should not be permitted to directly question a witness but rather should be required to submit their questions in writing to the trial judge, who should pose the questions to the witness in a neutral manner. *See Bush,* 47 F.3d at 516; *Sutton,* 970 F.2d at 1005-06. Written submission of questions eliminates the possibility that a witness will answer an improper question and prevents jurors from hearing prejudicial comments that may be imbedded in improper questions. *Bush,* 47 F.3d at 516. This procedure also allows the attorneys to make and argue objections without fear of alienating the jury. Moreover, the jury should be instructed throughout the trial regarding the limited purpose of the questions, the proper use of the procedure and should be constantly cautioned about the danger of reaching conclusions or taking a position before all of the evidence has been received or speculating about answers to unasked questions. Finally, the district

court should make clear to the jury "that questions are to be reserved for important points, that the rules of evidence may frequently require the judge to eschew certain questions, and that no implication should be drawn if a juror-inspired question withers on the vine." *Sutton,* 970 F.2d at 1005-06; *see Bush,* 47 F.3d at 516.

Ultimately, however, whether juror questioning constitutes an abuse of discretion is a factually intense inquiry requiring a case-by-case analysis. Thus, we turn to Richardson's specific claims in this case. At the outset, we note that the record reflects that the district court was well aware of the risks inherent in the juror questioning and went to great lengths to guard against them. First, the district court employed all of the recommended prophylactic measures, requiring written submissions, providing counsel with the opportunity to object privately, and exercising discretion in selectively choosing which questions were permissible and which questions would not be asked. Second, several times throughout the trial, the district court instructed the jury as to the limited purpose of the questions, the proper use of the procedure, and cautioned them about the danger of reaching conclusions before all of the evidence had been received. Finally, this was a factually complex case, involving allegations of money laundering, fraud and embezzlement. The trial in this matter spanned over six weeks, and the government's case-in-chief involved numerous witnesses and the introduction of hundreds of documentary exhibits. Because of the complexity of this case and the precautions taken by the district court, we cannot say that the district court's determination that the benefits to be gained by juror questioning in this case outweighed risk of prejudice constituted an abuse of discretion.

Notwithstanding the care taken by the district court, Richardson argues that the juror questioning led to premature deliberation by the jurors by encouraging them to talk with each other and to form premature conclusions about the evidence and the case, thereby depriving her of an impartial trial. Richardson, however, cites no record evidence indicating that the jurors actually talked to each other about the questions they planned to ask, and the questions posed do not reflect any opinion the jurors may have held regarding either the credibility of any single witness, or the guilt or innocence of Richardson. The questions asked were generally factual in nature and for the purposes of clarification and do not evidence premature deliberation by the jury, but rather reflect the desire to have a witness elaborate on a certain factual point. *See Feinberg,* 89 F.3d at 338. Richardson has failed to present any evidence of prejudice resulting from the juror questioning, and has failed to demonstrate that the district court abused its discretion in allowing the practice. Accordingly, we find no error based upon permitting the jurors to submit questions in this case.

*B. Jury Instructions On Power Of Attorney*

Richardson next argues that because she had abandoned her defense of reliance on a power of attorney from one of the victims, the trial judge erred by giving an instruction on power of attorney. At trial, Richardson objected to the instruction, arguing that it was both unnecessary and confusing because it was not tailored to the specific facts of this case. Richardson also expressed the fear that the instruction would lead the jury to treat a breach of the fiduciary obligation arising from a power of attorney as a separate offense, or equate such a breach with embezzlement, or confuse the elements of mail fraud and embezzlement. The district court overruled Richardson's objection and gave the proposed instruction.

The issue of power of attorney arose with regard to one of Richardson's fourteen alleged embezzlement victims, Virginia Craig. Craig was a customer of the bank and Richardson had befriended Craig at some point prior to August 1995. In August 1995, Craig, after being placed in a nursing home, gave Richardson a power of attorney over her financial affairs. The power of attorney was written in broad language, stating that Richardson could make gifts of Craig's money and property and apply for loans in Craig's name. Subsequently, Richardson made various withdrawals from Craig's accounts and ordered five credit cards in Craig's name.[4]

The government introduced evidence of this power of attorney in its case-in-chief and Richardson did not object. Early in the trial, Richardson relied on the plain terms of the power of attorney in justifying her actions. Subsequently, however, she abandoned this defense and instead argued that her conduct with regard to Craig was authorized because Craig had given her access to the bank accounts and permission to obtain credit in Craig's name as gifts. Richardson testified that she received the funds in Craig's accounts because Craig gave them to her, and not pursuant to the power of attorney.[5] Notwithstanding Richardson's

---

[4]The acquisition of these credit cards was the basis of the mail fraud charges.

[5]The briefs are unclear concerning the timing of and reasons for this change in defense. According to Richardson's brief, she raised the power of attorney defense during "preliminary discussions." Richardson Br. at 26-27. According to the government's brief, Richardson "initially" relied on this justification, but during her trial testimony began to advance the theory that Craig had given her a gift. *See* Government Br. at 39.

The government asserts that Richardson had to abandon its initial defense when the district court found that it was not correct as a matter of law and thus would not allow her to make that argument to the jury. *See* Government Br. at 44 (citing *Wheeless v. Gelzer,* 780 F.Supp. 1373, 1381 (N.D.Ga.1991)). Richardson states that early in the trial both sides agreed that the power of attorney allowed her to use funds from Craig's accounts and to obtain credit cards in her name. *See* Richardson Br. at 27. Nevertheless, Richardson further states that the power of attorney became a "non-issue" during the trial and was consequently abandoned by her. *Id.* at 27.

ultimate position, the power of attorney was introduced into evidence and testimony regarding it was received, and we review the issue of this jury instruction in this context.

Jury instructions are reviewed *de novo* "to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." *United States v. Chandler,* 996 F.2d 1073, 1085 (11th Cir.1993). "The district court has broad discretion in formulating a jury charge so long as the charge as a whole accurately reflects the law and the facts." *United States v. Turner,* 871 F.2d 1574, 1578 (11th Cir.1989) (citing *United States v. Silverman,* 745 F.2d 1386, 1395 (11th Cir.1984)). "On appeal, we examine whether the jury charge, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *United States v. Starke,* 62 F.3d 1374, 1380 (11th Cir.1995) (quoting *Wilkinson v. Carnival Cruise Lines, Inc.,* 920 F.2d 1560, 1569 (11th Cir.1991)). Thus, this Court will not reverse a conviction unless, "after examining the entire charge, [we] find that the issues of law were presented inaccurately, the charge included crimes not contained in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process." *Turner,* 871 F.2d at 1578 (internal citations omitted).

Under the circumstances of this case we find no reversible error. Proof was presented at trial concerning the power of attorney given to Richardson by Craig. Given a district court's broad latitude in crafting its jury instructions, and having reviewed the totality of the record, we do not find that the jury instructions given, considered as a whole, improperly guided the jury, misstated the law or violated due process.

### C. Summary Exhibits

Finally, Richardson argues that reversal is warranted because the heading used in one of the government's exhibits usurped the jury's function. During the government's case-in-chief concerning the embezzlement counts, the government offered into evidence summary charts prepared by its expert witness, Joseph Knorr, describing the transaction histories of the accounts of the fourteen alleged embezzlement victims. Each summary chart included one column with the heading "unauthorized activity." This column listed transaction amounts that Knorr believed—based on interviews with the account holder and an analysis of financial records—to be unauthorized by the account holder.

The government's presentation of these charts followed a pattern. First, the government would

introduce testimony from an alleged victim noting discrepancies in his or her accounts. Next, the government would present testimony by Knorr concerning each of that victim's accounts. In connection with that testimony the government introduced the summary chart prepared by Knorr that corresponded to that victim. In addition to being admitted into evidence, the spreadsheet was enlarged and projected onto a screen during Knorr's testimony.

When the first summary chart was offered into evidence, Richardson objected to the label "unauthorized activity," alleging that it was conclusory and prejudicial. The district court admitted the exhibit with a limiting instruction explaining that whether the activity was unauthorized was a question for the jury. Subsequently, the government offered and the district court admitted into evidence separate summary charts in conjunction with nine of the fourteen alleged embezzlement victims. In each instance the district court gave a limiting instruction to the jury stating that whether the activity in the account was in fact unauthorized was an issue for the jury to decide. The government also had the expert witness testify that the label "unauthorized activity" represented Knorr's opinion.

After the ninth summary chart was offered into evidence, the government changed the labels from "unauthorized transaction" to "questioned transaction" for the remainder of the trial. Richardson argues that notwithstanding the limiting instructions which were given, and the fact that the heading was changed prior to the jury's deliberations, she is entitled to a reversal of her conviction.

A district court's use of summary charts is reviewed for an abuse of discretion. *See United States v. Norton,* 867 F.2d 1354, 1362 (11th Cir.1989); *Gordon v. United States,* 438 F.2d 858, 876 (5th Cir.1971) (district court's rulings concerning summary charts are subject to review "only upon a clear showing of abuse and resulting prejudice to an accused"). Summary charts are permitted generally by Federal Rule of Evidence 1006 and the decision whether to use them lies within the district court's discretion. *See United States v. Diez,* 515 F.2d 892, 906 (5th Cir.1975). Nevertheless, this Circuit has noted that summary charts are to be used with caution, due to their potential for abuse. *See Norton,* 867 F.2d at 1362. Indeed, "a trial court is charged with grave responsibilities to make certain that an accused is not unjustly convicted in a 'trial by charts.' " *Gordon,* 438 F.2d at 876 (quoting *Lloyd v. United States,* 226 F.2d 9, 16 (5th Cir.1955)).

In avoiding such harm, "the essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record." *Diez,* 515 F.2d at 905. Thus, this court will permit the use of summary charts incorporating certain assumptions "so long as

supporting evidence has been presented previously to the jury ... and where the court has 'made it clear that the ultimate decision should be made by the jury as to what weight should be given to the evidence.'" *United States v. Francis,* 131 F.3d 1452, 1458 (11th Cir.1997) (quoting *United States v. Means,* 695 F.2d 811, 817 (5th Cir.1983)). *See Norton,* 867 F.2d at 1363; *United States v. Daniels,* 986 F.2d 451, 456 (11th Cir.1993) (upholding the use of summary charts when the court instructed the jury that the charts presented what the government contended the evidence in the record shows, and that therefore the jury must evaluate the evidence independently); *see also United States v. Acevedo,* 141 F.3d 1421, 1426 (11th Cir.1998) ("We assume that jurors follow their instructions."). Furthermore, where the defense has the opportunity to cross-examine a witness concerning the disputed issue and to present its own version of the case, "the likelihood of any error in admitting summary evidence diminishes." *Norton,* 867 F.2d at 1363. Finally, it should be noted that the fact-finder is not required to accept the information presented on summary charts as true. *See United States v. Massey,* 89 F.3d 1433, 1441 (11th Cir.1996).

Under the facts presented here, Richardson cannot successfully claim harm from the use of the summary charts. The district court issued numerous limiting instructions to the jury. The government's witness, Knorr specifically testified that the label "unauthorized transaction" represented his opinion. Richardson had the opportunity to cross-examine Knorr. The label was ultimately changed before the charts went to the jury. We find no reversible error.

For all the foregoing reasons, we find that Richardson's convictions must be

AFFIRMED.

WILSON, Circuit Judge, concurring:

I write separately only to express my reservations about the practice of permitting juries to submit questions to witnesses during the course of a trial. This record provides no basis for a finding of error as a result of the trial judge permitting jurors to submit written questions to witnesses. The issues in this case are complex and the trial judge utilized sufficient precautions to reduce any possibility of unfair prejudice. However, my view is that the practice of permitting jurors to submit questions to witnesses should be relegated to rare or extraordinarily complex cases in which it is clearly necessary. Few trials fit this category. I agree with the Seventh Circuit that the practice should not be encouraged, but discouraged. *See United States v. Feinberg,* 89 F.3d 333, 336 (7th Cir.1996).

Other Circuits agree. The Second Circuit "strongly discourage[s]" its use, for the very same reason

that Richardson objected to its use in the present case—it "risks turning jurors into advocates, compromising their neutrality" and "is a subliminal invitation to launch prematurely into evaluating the evidence." *United States v. Bush,* 47 F.3d 511, 515 (2d Cir.1995). These dangers are considerable and "can undermine the orderly process of the trial to verdict." *DeBenedetto v. Goodyear Tire and Rubber Co.,* 754 F.2d 512, 516, 517 (4th Cir.1985).

The most troubling problem associated with juror questioning is the potential to convert jurors into partial advocates. *See Bush,* 47 F.3d at 515. This threatens the foundation of our judicial system and the jury's role as a neutral factfinder. *See DeBenedetto,* 754 F.2d at 516. Remedial instructions by the court cannot always remedy the adverse effects that may ensue from jurors' questions, especially when counsel waives issues on appeal by not objecting to questions for fear of antagonizing the jury. *See Bush,* 47 F.3d at 515.

In Richardson's case, the district court employed appropriate safeguards to minimize the risks associated with the practice. The judge required the jurors to reduce their questions to writing for their consideration by the judge prior to their submission to the witnesses. Counsel's objections were heard at sidebar outside of the hearing range of the jurors and the questions were not of such number and character to rise to an objectionable level so as to compromise the fairness of Richardson's trial. As a general rule, however, "the risks outweigh the benefits." *Feinberg,* 89 F.3d at 337.

The First Circuit has held that the practice of permitting jurors to submit questions to witnesses during the course of a contested trial "should be employed sparingly and with great circumspection." *United States v. Sutton,* 970 F.2d 1001, 1005 (1st Cir.1992). This is particularly true in a criminal trial where:

> The dynamics ... are extremely sensitive. Innovations that carry the potential for disrupting those dynamics are risky. Juror participation in the examination of witnesses represents a significant innovation, transferring the jurors' role from a purely passive one to a partially interactive one. The practice also delays the pace of the trial, creates a certain awkwardness for lawyers wishing to object to juror-inspired questions, and runs a risk of undermining litigation strategies.

*Id.* Although the trial judge may take precautionary measures similar to those employed in the present case to avoid unfair prejudice, such measures may have the potential to "embarrass or even antagonize the jurors if they sense that their pursuit of the truth has been thwarted by rules they do not understand." *Bush,* 47 F.3d at 515. Even with remedial instructions, "the poison introduced by an improper inquiry from a fellow juror has already been absorbed by the entire jury." *Id.*

I concur in the panel opinion, given well-established authority that permitting juror questions in a

criminal case is a matter that is vested within the sound discretion of the trial court. *See id.* at 514; *Sutton,* 970 F.2d at 1005. Federal Rule of Evidence 611(a) permits the trial court to " 'exercise reasonable control over the mode and order of interrogating witnesses.' " *Bush,* 47 F.3d at 514. Courts must balance the benefits and risks of juror questioning and their respective effect on litigants, witnesses, attorneys, jurors and the judicial system. My study of the issue leads me to believe that, in most cases, the dangers of the practice outweigh the benefits. Although this case presents no reversible error resulting from its use, I believe that the practice should be used sparingly.