[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12363

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2012
JOHN LEY
CLERK

D. C. Docket No. 1:09-cr-20666-JAL-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YASMANNY BENAVIDES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 24, 2012)

Before EDMONDSON and MARTIN, Circuit Judges, and FULLER,* District
Judge.

PER CURIAM:

_____

* Honorable Mark E. Fuller, United States District Judge for the Middle District of
Alabama, sitting by designation.

# I. INTRODUCTION

Yasmanny Benavides appeals his conviction and sentencing on two counts of healthcare fraud and one count of conspiracy to commit the same. He alleges error on a number of rulings made by the district court. He also claims the court erred by applying to his sentence the four-level "organizer or leader" enhancement found in the *Sentencing Guidelines*. For the reasons discussed below, the district court's decision is AFFIRMED.

# II. BACKGROUND

Miami was a hotbed for Medicare fraud in the early 2000s. One popular scheme involved forging prescriptions for expensive Durable Medical Equipment (DME), and then using an equipment company to invoice Medicare for reimbursement. To combat this epidemic, the FBI began a number of investigations in the Miami area. And these investigations bore fruit: the agency executed about 40 search warrants on August 18, 2004, including one to search All-Med Billing, a company that helped a number of DME companies commit fraud.

Against this backdrop, Reinaldo Guerra—the Government's star witness against Benavides—ran more than 21 fraudulent DME companies. Guerra got his start in 2002, acting as the straw owner of Kathy Medical, a DME company engaged in billing Medicare fraudulently. Another man, Jose Luis Perez, had

provided the purchase money for Kathy, handled all of the initial paperwork, and brought Guerra into the fold. Once in, Guerra cashed the Medicare checks sent to Kathy at Cashflow Financial, a check-cashing outfit, and divided the profits with Perez after repaying him the initial purchase money. To protect Perez, only Guerra's name appeared on Kathy's paperwork. The duo eventually closed Kathy Medical, and Guerra graduated from his role as straw man, assuming ownership of two new companies. One of these was Lacary Medical, a company that Guerra had purchased at the suggestion of Greico Herrada.

It was at this point that Benavides entered the picture. Guerra and Herrada proposed that Benavides sign on as the nominal owner of Lacary, which required him to put his name on the paperwork closing the sale and the documents authorizing All-Med to do Lacary's billing. In return, Benavides received 20% of the company's profits.

Medicare eventually quit paying claims made by Lacary. At this point, Benavides asked Guerra to set up another DME company. According to Guerra's testimony, Erich Ruiz found Lily Orthopedic and agreed to sign on as nominal owner. Benavides and Guerra bought Lily for $90,000 on November 21, 2003, and they installed Ruiz as the strawman as planned. Ruiz, like Guerra and Benavides before him, signed the documents necessary for All-Med to handle the Medicare

billing for Lily and for Cashflow to cash the Medicare checks obtained through the scheme.

All told, the trio bilked Medicare out of $4.7 million using Lily, a company that neither bought nor sold a single piece of medical equipment from December 2003 to August 2004, the time of the alleged conspiracy.

### III. THE PROCEEDINGS BELOW

This case began when the United States indicted Benavides and Ruiz on August 4, 2009. The indictment charged the pair with conspiracy to commit health care fraud (Count 1); three substantive counts of health care fraud (Counts 2–4); and three counts of aggravated identity theft (Counts 5–7).[1] Ruiz pled guilty; Benavides took his case to trial.

Just before trial, Benavides sought to keep evidence related to the Lacary fraud from coming into evidence. To this end, he filed a motion in limine, which the district court denied. The district court's order also denied Benavides' request to limit the scope of the evidence presented about Lacary. The court did however grant Benavides' request for a standing objection to the admission of the Lacary evidence.

---

[1] The relevant statutes are 18 U.S.C. §§ 1349 (Count 1), 1347 (Counts 2–4), and 1028A (Counts 5–7).

During the trial, Benavides objected to the Government's attempt to introduce documents found during the FBI's search of Cashflow. These documents—which ostensibly linked Benavides to Lily—were receipts with handwritten notations. Three of the receipts had written on them "Benabide (Lily Orthop.)." The other one read, "King (Lily orthopedidic)." Benavides claimed the receipts were inadmissible hearsay and, either way, lacked sufficient authentication. The Government responded, claiming that Raul Martinez, a Cashflow employee, wrote them, and that testimony by Rolf Gjertsen, an FBI agent, provided a sufficient foundation for admitting the receipts. The district court overruled Benavides' objection and allowed in the evidence as a co-conspirator statement.

Benavides likewise objected to the Government's use of summary charts in its case-in-chief. The objection had its genesis in the Government's decision to call fourteen doctors who had their physician numbers used by either Lacary or Lily to submit false claims to Medicare. The Government had summary charts prepared so the doctors could easily identify the claims submitted under each doctor's name and physician number. Because the title on each chart read "Lacary Medical

Equipment/Lily Orthopedic,"[2] Benavides objected and claimed that the charts would tend to mislead the jury by commingling the claims submitted by each company, thus conflating the two schemes. The district court overruled this objection too.

Guerra testified at length about his involvement in the Kathy, Lacary, and Lily schemes. During cross-examination, Benavides brought up the deal given to Guerra for testifying and established that Guerra sought to get his 14-year sentence reduced by up to a third because of his cooperation. The *Sentencing Guidelines* calculation was important to the defense's cross, because it showed that Guerra had something to gain from the Government by testifying. Confusion ensued after the prosecution's redirect on the issue, and as a result, Benavides sought to recall Guerra after he had left the stand. The district court denied Benavides' request.

Ruiz testified against Benavides at trial too. During his testimony, it came out that he had a prior conviction for selling prescription drugs illegally and for operating an illegal Internet pharmacy. Ruiz denied that his previous charges dealt with forging prescriptions, however, claiming that he merely continued working with a pharmacist whose license had expired. When Benavides attempted to cross

---

[2] The Government also introduced two additional charts that listed separately the total billings for Lacary and Lily by each doctor.

Ruiz about the facts underlying his prior conviction, the prosecution objected. Benavides responded by claiming that he should get to inquire into the underlying facts of each crime "because the facts of his conviction are extremely relevant to the facts of this case." (VIII Tr. at 149.) The district court disagreed and excluded the evidence because Benavides could not establish that Ruiz's convictions had any connection to the case at hand.

Benavides testified as well. While on the stand, he admitted his involvement with Lacary, yet he maintained his innocence as to the Lily scheme. Benavides said that Herrada offered him a job with Lacary, telling Benavides that he would act as President of the company since Guerra wanted to keep his name off of any company documents. This prompted a hearsay objection by the Government. Benavides' counsel responded by stating that Benavides knew the statements were false and that he did not want to offer them for the truth of the matter. The court overruled the objection and then issued an instruction, telling the jury, "These statements are not coming in for the truth of the matter asserted." Benavides then went on to describe his involvement in Lacary and how he disassociated himself with the company.

At close, the Government told the jury that it had failed to indict Benavides for his involvement with Lacary before the five-year statute of limitations ran.

Benavides immediately moved for a mistrial, which the district court denied. As the Assistant United States Attorney continued with his closing, he told the jury they could use Benavides' involvement with Lacary "as proof of the Defendant's involvement with Lily Orthopedic." Then, he claimed that the adding machine receipts were unassailable because they were not subject to cross-examination. He also referred to the "yeomen's work" the FBI agents testifying for the Government "did on behalf of the American public." Finally, he responded to Benavides' argument about not initially knowing of Lacary's fraudulent nature by asking, "At what point does a law-abiding person walk out the door?"

At the end of closing arguments, the district court overruled Benavides' objection to the offered conspiracy instruction and denied his request asking the court to amend it to include the object of the conspiracy as the third element of the crime. The district court then sent the case to the jury.

The jury returned with a split verdict: it convicted Benavides on the first four counts (conspiracy and health care fraud) but acquitted him on the last three (aggravated identity theft). At his sentencing, Benavides received an initial base offense level of six under § 2B1.1(a)(2) of the *United States Sentencing Guidelines*. Numerous enhancements applied, including a 20-level increase because the loss surpassed $7 million but fell short of $20 million, U.S.S.G. §

2B1.1(b)(1)(k); a 4-level bump because Benavides acted as an organizer or leader of a criminal activity involving five or more people or that was otherwise extensive, U.S.S.G. § 3B1.1(a); and, finally, a 2-level addition for obstruction of justice, U.S.S.G. § 3C1.1.

Shortly afterward, the district court sentenced Benavides to 144 months in prison and ordered him to pay restitution. He now asks for a new trial or, in the alternative, a reduced sentence.

## IV. DISCUSSION

### A. Admission of evidence of the uncharged Lacary fraud, fourteen summary charts, and the handwritten notations on four adding machine tapes

We begin with the district court's decision to allow in certain pieces of evidence over objections made by Benavides. In reviewing these matters, we apply a deferential abuse of discretion standard to the district court's rulings. *United States v. Trujillo*, 146 F.3d 838, 843 (11th Cir. 1998). If we find an abuse of discretion, we still will not reverse the trial court—at least not on a non-constitutional question—unless there exists a reasonable likelihood the error affected the defendant's substantial rights. *United States v. Range*, 94 F.3d 614, 620 (11th Cir. 1996). With this in mind, we address each of Benavides' allegations related to the district court's evidentiary rulings.

## 1.     Evidence of the uncharged Lacary scheme

Benavides claims the district court abused its discretion by admitting evidence of the Lacary fraud as "inextricably intertwined" with the charged offense. More specifically, he claims the Lacary and Lily fraud were distinct events, thus making the Lacary evidence inadmissible, for it would tend to prove Benavides' character (fraudster) and show action in conformity with that character (the fraudster committed fraud).[3] We disagree.

True, a party generally cannot use "[e]vidence of other crimes, wrongs, or acts" to prove a person's bad character and "show action in conformity therewith." Fed. R. Evid. 404(b). But bad acts evidence falls outside of this prohibition—indeed, it falls outside of Rule 404(b) altogether—if it is not extrinsic to, but instead part of, the charged crime. This occurs if the bad acts are "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. Utter*, 97 F.3d 509, 514 (11th Cir. 1996).

For example, in *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir.

---

[3] Benavides also alleges the district court erred by holding, in the alternative, that it could admit the evidence for "other purposes" besides character. *See* Fed. R. Evid. 404(b). Because we find the district court properly admitted the Lacary evidence as inextricably intertwined with the charged offense, we need not reach this question.

1989), this Court upheld a district court's admission of testimony about one of the

defendant's prior drug smuggling trips while on trial for a later one, because the

central issue was whether the defendant just went along for the ride or if he

actively participated in the scheme. In upholding the district court's decision, this

Court stated:

> Testimony concerning the September 13th trip did not
> merely implicate Mr. Foster's bad character or propensity
> to traffick in drugs, it specifically described his
> participation in a scheme involving the same mode of
> transportation (a commercial airline) between the same
> cities (Miami and Savannah), to smuggle the same
> amount (one kilogram) of the same drug (cocaine), in the
> same manner of hiding it (in a girdle) on the same person
> (Ms. Davis)—only 17 days prior to his arrest for a
> virtually identical transaction.

*Foster*, 889 F.2d at 1053. Here, the Lacary testimony described Benavides'

participation in a scheme involving the same manner of fraud (submitting false

Medicare claims), using the same type of company (one claiming to sell DME),

hiring the same intermediaries to bill the claims and launder the money (All-Med

and Cashflow), and involving the same main players (Guerra and

Benavides)—shortly after Medicare quit making reimbursement payments to

Lacary. The district court, therefore, stayed within its sound discretion by

admitting the evidence as inextricably intertwined with the charged offense.

### 2. The fourteen summary charts

For the sake of convenience, a party can use summary charts to present in court "otherwise volumunious" information. Fed. R. Evid. 1006. Still, "summary charts are to be used with caution, due to their potential for abuse," *United States v. Richardson*, 233 F.3d 1285, 1293 (11th Cir. 2000), and a trial court has "to make certain that an accused is not unjustly convicted in a 'trial by charts.'" *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971) (citations omitted).[4] But the likelihood of error in admitting a summary chart diminishes "where the defenses has the opportunity to cross-examine a witness concerning the disputed issue and to present its own version of the case." *Richardson*, 233 F.3d at 1294.

In *Richardson*, the district court gave numerous limiting instructions to the jury, the Government's witness said the chart's label represented only his opinion, and the label was ultimately changed before the charts went to the jury. 233 F.3d at 1294. Benavides makes much of the district court's failure to use the exact same prophylactic measures in his case. But *Richardson* created no such rigid requirement. To the contrary, this Court stressed that district courts have wide discretion to admit summary charts "so long as supporting evidence has been presented previously to the jury" and "the court has 'made clear that the ultimate

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

12

decision should be made by the jury as to what weight should be given to the evidence." *Id.* (quoting *United States v. Francis*, 131 F.3d 1452, 1458 (11th Cir. 1997)).

Here, the Government used two additional charts to separate out the Lacary and Lily frauds, which lessened the possibility of juror confusion. Benavides also had an opportunity to cross-examine Gjertsen on all of the charts, thus giving him the opportunity to clear up any misconceptions about the nature of the schemes. Most importantly, the underlying facts and jury instructions made clear that Benavides was on trial for the Lily scheme instead of the Lacary fraud, which helped minimize the likelihood of error. *See United States v. Scott*, 2011 WL 2150099 (11th Cir. 2011) (per curiam). The district court consequently did not err by admitting the summary charts.

### 3.    The handwritten notations on the adding machine tapes

A statement falls outside of the definition of hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit evidence under this rule, there "must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175 (1991) (citing Fed. R.

13

Evid. 801(d)(2)(E)); *United States v. West*, 142 F.3d 1408, 1414 (11th Cir. 1998), *vacated on other grounds*, 526 U.S. 1155 (1999).

Benavides claims the district court erred by admitting the notes without knowing the identity of the author or the circumstances surrounding the drafting. But a district court need not specifically identify the author if circumstantial evidence shows that the document's author had intimate involvement in the operation of the conspiracy. *United States v. Smith*, 918 F.2d 1510, 1510–11 (11th Cir. 1990). Only without such circumstantial proof does "uncertainty as to the identity of the declarant . . . implicate[] the concerns which justify the general prohibition on hearsay evidence; namely, its lack of trustworthiness." *United States v. Christopher*, 923 F.2d 1545, 1551 (11th Cir. 1991).

The district court made the findings required by *Bourjaily*. Judge Lenard found that the conspiracy existed, that Benavides was a member, and that someone made the notations in furtherance of the conspiracy. And although the unknown identify of the author is troublesome, circumstantial evidence indicates the document's trustworthiness: testimony established that Benavides and Guerra used Cashflow Financing to further their conspiracy, that the FBI found the tapes at Cashflow, and that the FBI maintained a sound chain-of-custody.

The receipts, moreover, referred to Benavides and "King," which was

Guerra's nickname. In *Smith*, the trial court admitted a ledger with an unknown author that made reference to other co-conspirators, partly because the color codes in the ledger matched a color-coded business card found on one of the defendants during a search. 918 F.2d at 1505. Like the business card in *Smith*, which connected the co-conspirators and conspiracy itself to the ledgers, the references to both Benavides and Guerra on the receipts, combined with Guerra's testimony about the duo engaging in a conspiracy to defraud Medicare, connects the adding tape notations to Benavides and the conspiracy itself. And this connection suggests that the author, although unknown, had an intimate connection with the conspiracy—or at least a close enough connection for the trial court to admit the evidence. Thus, the trial court did not abuse its discretion by admitting the four adding machine receipts.[5]

**B.     The district court's decision to limit Benavides' cross-examination of some of the Government's key witnesses**

To merit reversal for limiting the permissible scope of cross-examination, the district court must commit a clear abuse of discretion. *United States v. Jones*, 913 F.2d 1552, 1564 (11th Cir. 1990); *United States v. Calle*, 822 F.2d 1016, 1019–1020 (11th Cir. 1987). A district court has no power, however, to keep a

---

[5] In any event, even if we assume the district court erred, Benavides failed to brief whether such an error would amount to a reversible one.

defendant from impeaching a witness's credibility with prior convictions for crimes involving dishonesty. Fed. R. Evid. 609(a)(2) ("evidence that any witness has been convicted of a crime *shall* be admitted . . . if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.") (emphasis added); *United States v. Toney*, 615 F.2d 277 (5th Cir. 1980). In fact, "a cross-examiner has an absolute right to introduce a crimen falsi conviction for impeachment purposes." *Toney*, 615 F.2d at 278. But this rule does not apply to impeachment by contradiction or to convictions offered to prove things like knowledge, intent, or identity under Rule 404(b). *See, e.g.*, *United States v. Watchmaker*, 761 F.2d 1459, 1474 (11th Cir. 1985) (holding conviction not subject to Rule 609 when offered for purpose other than impeaching credibility with conviction involving dishonesty); *United States v. Davis*, 787 F.2d 1501, 1504 (11th Cir. 1986) (citing *Watchmaker* and stating, "In this case, the government asked Davis about the conviction not to cast doubt on his credibility but to dispel the illusion that he gave the jury that he had never possessed an illegal substance."); Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 6:57 (3d ed. 2011) ("[Rule] 609 does not apply to convictions offered to refute a witness who denies the underlying misconduct, or to prove circumstantially such things as knowledge, intent, or identity under [Rule]

16

404(b).").

### 1. Limiting cross-examination into the underlying facts of Ruiz's prior conviction involving dishonesty

Benavides claims the district court erred by barring him from impeaching Ruiz with a prior conviction. While testifying, Ruiz admitted to an arrest for participating in an illegal Internet pharmacy scheme. When Benavides' attorney asked Ruiz about a second set of charges stemming from the same incident, Ruiz claimed the new charges dealt with him working with a pharmacist after his license had expired. Defense counsel asked about the second charge in more detail; the prosecution objected. At this point, Judge Lenard held a sidebar and, after defense counsel asserted that Ruiz's prior conviction related to the charged offense, prohibited further questioning into the matter.

Benavides claims Rule 609(a)(2) allowed him to question Ruiz on the underlying facts of the second conviction because the crime involved dishonesty and since Ruiz allegedly misrepresented the nature of the conviction. But Benavides' attorney proffered to Judge Lenard that she sought to have the convictions admitted to show that Ruiz learned from Guerra how to engage in the fraud for which Ruiz was arrested in 2005. Defense counsel never argued that the prior convictions involved proof of acts of dishonesty or false statements by Ruiz. Thus Rule 609(a)(2) did not apply to Judge Lenard's decision; Rule 404(b) did.

17

*See Watchmaker*, 761 F.2d at 1474.

Under Rule 404(b), Judge Lenard had leeway to limit the line of questioning Benavides' counsel sought to employ, especially considering how Ruiz denied a connection between the two cases. *See* Fed. R. Evid. 404(b)(2) (providing trial court discretion to admit or exclude bad acts evidence used to prove "purpose, . . . motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). In fact, Judge Lenard appears to have implicitly undertook the Rule 404(b)(2) analysis by asking defense counsel during the sidebar whether Ruiz's prior conviction had any connection to the charges against Benavides. After she did, defense counsel replied, "it's my theory, your Honor, that he learned how to do all this while he was working with Reinaldo Guerra," to which the court responded, "But you haven't been able to establish that. [Ruiz] said no to that question." (VIII Tr. at 150.) This exchange makes clear that Benavides' lawyer sought to ask Ruiz about his convictions not to impeach his credibility by showing that he had committed a crime involving dishonesty, but instead to show that Guerra had taught Ruiz how to commit fraud. Because the convictions fell outside the ambit of Rule 609 when offered for this reason, we cannot say that Judge Lenard abused her discretion by prohibiting questioning into

18

the details surrounding Ruiz's conviction for forging prescriptions.[6]

## 2. Limiting cross-examination of Agent Gjertsen

Benavides alleges the trial court abused its discretion by deciding to limit his cross-examination of Rolf Gjertsen, the FBI agent who testified for the Government. He claims that by keeping defense counsel from asking Gjertsen about whether he prepared the charts in anticipation of litigation, the court ran afoul of *Delaware v. Van Arsdall*, a case finding that a Sixth Amendment violation occurs when a trial court cuts off all questioning about the source of a witness's bias. 475 U.S. 673 (1986).

In *Van Arsdall,* the Supreme Court held that a criminal defendant should get to expose "a witness' motivation for testifying." 475 U.S. at 679. And given this right, the trial court in that case erred by barring defense counsel from asking about the deal the witness received from the government in exchange for testifying. *Id.* Still, the *Van Arsdall* Court made clear that the Confrontation Clause does not "prevent[] a trial judge from imposing . . . limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Id.*

Whereas *Van Arsdall* dealt with asking about the presence of a plea deal

---

[6] Although Judge Lenard invoked Rule 609 instead of Rule 404(b) for support, we may affirm a district court's decision on any ground supported by the record. *See, e.g., Trotter v. Dep't of Corrs.*, 535 F.3d 1286, 1291 (11th Cir. 2008).

exchanged for the witness's testimony, this case deals with Benavides' lawyer's attempts to ask Agent Gjertsen about preparing charts in anticipation of litigation. The answer to the former is far more probative of bias than the answer to the latter. What is more, Agent Gjertsen took part in the investigation of Benavides, which likely made it apparent to the jury that he played for the same team as the Government. So unlike the witness in *Van Arsdall* who had a hidden motivation for cooperating, Gjertsen's potential bias was patent. Given these differences, and because Judge Lenard permitted questioning about the charts until defense counsel began asking redundant questions about what each one plainly said, the district court exercised its discretion without violating Benavides' constitutional right to confront witnesses against him. *See Van Arsdall*, 475 U.S. at 679 ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues . . . or interrogation that is repetitive or only marginally relevant.").

### 3. Limiting cross-examination regarding Guerra's benefits for cooperating

Benavides next claims the district court erred by allowing a misstatement by Guerra to go uncorrected. During Guerra's direct examination by the Government, the prosecutor elicited from him that the Court used $99 million as the final loss

figure for calculating his sentencing guideline range. Guerra further stated that he did not receive a break because the court sentenced him to a top-of-the-guidelines range despite the Government recommending a sentence at the bottom of the range. But during Benavides' cross, Guerra admitted that the Government refrained from charging him for other frauds that would have pushed his guidelines calculation higher, thus showing that Guerra did in fact receive a benefit from the Government despite his claims to the contrary.

On redirect, the prosecutor asked, "If you were charged with $179 million in loss, you had, what, some $21 million to go before you could fall into the next highest category?" Guerra answered yes and, significantly, Benavides' lawyer failed to object to either the question or the answer. Yet defense counsel sought to recall Guerra and re-cross him. The district court denied this request, stating that Benavides made clear that Guerra received benefits for testifying.

The district court stayed within its discretion here for two reasons. First, Benavides had an opportunity to cross-examine Guerra. And defense counsel used that opportunity to impugn Guerra's credibility by showing he received a greater benefit from the Government than he initially let on during direct examination. Second, Benavides failed to object to any incorrect impressions created by the prosecution during re-direct. The district court, therefore, did not abuse its

21

discretion by denying the request to recall Guerra for re-cross.

## C.  Benavides' claims of prosecutorial misconduct

A prosecutorial misconduct claim requires a defendant to show that the prosecutor acted improperly and that the improper conduct prejudicially affected his substantial rights. *Sexton v. Howard*, 55 F.3d 1557, 1559 (11th Cir. 1995) (citation omitted). The defendant also must show that, but for the improper conduct, the trial would have produced a different outcome. *Id.*; *United States v. Eyster*, 948 F.2d 1196, 1206–07 (11th Cir. 1991). In undertaking this inquiry, we must evaluate the prosecutor's remarks "in the context of the trial as a whole and assess their probable impact on the jury." *United States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998). And we must do so while keeping in mind that the trial court sits in the best position to evaluate the prejudicial effect of evidence on the jury, meaning that we will only overturn the a trial judge's decision if she abused her discretion in denying a motion for a mistrial. *United States v. Mendez*, 117 F.3d 480, 484 (11th Cir. 1997).

During closing arguments, the prosecutor referenced the statute of limitations and explained how it kept the Government from charging Benavides for the Lacary fraud. These comments were improper: they lacked relevance while suggesting to the jury that Benavides escaped criminal liability on a technicality for

22

a fraud that he admitted to participating in.[7] *Cf. Olinger v. Comm'r of Internal Revenue*, 234 F.2d 823, 824 (5th Cir. 1956) ("[T]he risk that a jury will convict the defendant for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance."). Even so, we cannot look at these comments in a vacuum. Rather, we have to look at the totality of the evidence and ask whether a different outcome would have resulted but for the prosecutor making the comments.

We are not so convinced. The trial produced plenty of evidence implicating Benavides in defrauding Medicare and entering into a conspiracy to use Lily Orthopedic to this end. Guerra, a co-conspirator, testified on this point. So too did Ruiz, another co-conspirator. The adding machine tapes found at Cashflow amounted to documentary evidence linking Benavides to the fraud. And his own admissions related to his participation in Lacary showed that he had the knowledge

---

[7] It is also worth noting that the Government knew about Benavides' involvement in Lacary in 2004—well within the limitations period—yet declined to prosecute him for it. That the Government knew of Benavides' involvement allowed the jury to infer the Government's failure to prosecute Benavides meant it did not have a solid case against him. This alternative inference (the Government did not have a case so it voluntarily decided not to prosecute) weakens the improper inference (Benavides got away with the Lacary fraud on a technicality), thus lessening, although not negating, "the risk that [the] jury . . . convict[ed] . . . for crimes other than those charged." *Olinger v. Comm'r of Internal Revenue*, 234 F.2d 823, 824 (5th Cir. 1956).

necessary to carry out such a scheme. Given the overwhelming amount of evidence implicating Benavides, we cannot say that anything more than a speculative probability exists as to whether the jury would have acquitted him but for the prosecutor's improper remarks.

## D.    Benavides' cumulative error claim

Benavides claims that the issues discussed above, combined with an ostensibly improper jury charge and hearsay instruction, establish cumulative error.

A claim of cumulative error looks to "the prejudicial effect of all evidentiary errors, evaluated under both preserved and plain error standards, in the aggregate. *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005) (citations omitted). A court will overturn a verdict "if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless." *Id.* In addressing a cumulative error claim, "courts look to see whether the defendant's substantial rights were affected." *Id.* at 1224. "The total effect of the errors on the trial will depend, among other things, on 'the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); the strength of the government's case,' and the length of trial." *Id.*

Because the district court did not err as to the claims already discussed, Benavides' claim of cumulative error hinges on an allegedly improper jury charge and limiting instruction. Beginning with his jury charge claim, Benavides had to show that his requested instruction correctly stated the law, concerned an issue so substantive that its omission impaired his defense, dealt with an issue properly before the jury, and was omitted from the charge actually give to the jury. *United States v. Dulcio*, 441 F.3d 1269, 1275 (11th Cir. 2006) (citations omitted). He cannot meet the first *Dulcio* prong: his proffered jury instruction dealt with 18 U.S.C. § 286, which has a third element, instead of the statute he allegedly violated, 18 U.S.C. § 1349, which has only two elements. As to the hearsay instruction given by the trial court on its own motion, Benavides claims that the phrase "not coming in for the truth" suggested that Benavides' testimony lacked trustworthiness. But not only was the instruction a correct statement of the law, see Fed. R. Evid. 801(c), Benavides' own lawyer said, in front of the jury, "It's not offered for the truth, your Honor," right before Judge Lenard used similar phrasing in her limiting instruction.[8] Because the trial court did not err as to the claims raised by Benavides, his cumulative error claim fails.

---

[8] Defense counsel also said, within earshot of the jury, "Your Honor, again, not being offered for the truth of the matter asserted, but being offered to show the effect on the listener and what actions he took."

**E.      The "organizer or leader" enhancement**

As a general rule, this Court reviews de novo a district court's interpretation of the *Sentencing Guidelines*. *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004). Under the *Guidelines*, a district court can impose a four-level enhancement to a defendant's sentence "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). "To qualify for an adjustment under this section, the defendant must have been organizer, leader, . . . of one or more other participants." U.S.S.G. § 3B1.1 cmt. n.2; *United States v. Curtis*, 635 F.3d 704, 720 (5th Cir. 2011) (finding defendant only had to supervise one other culpable participant to make defendant eligible for organizer or leader enhancement). In addition, more than one person can qualify as an organizer or leader of a criminal conspiracy. U.S.S.G. § 3B1.1 cmt. n.4; *United States v. Vallejo*, 297 F.3d 1154, 1169 (11th Cir. 2002) ("The defendant does not have to be the sole leader or kingpin of the conspiracy in order to be considered an organizer or leader within the meaning of the Guidelines").

Benavides argues the district court erred by applying the "organizer or leader" enhancement to him, claiming that it only applies when a defendant directly organized or led five or more persons. He supports this contention in two

ways. First, he asserts the district court failed to find specifically that he organized or led five or more other culpable participants. Second, he points out that § 3B1.1(b), the three level-enhancement found in § 3B1.1, has a different structure—a structure that does not require the defendant to have organized or lead five or more persons—than the four-level enhancement found in § 3B1.1(a), which, by implication, requires the defendant to have directly led five or more people. Because of this structural difference, Benavides reasons, § 3B1.1(b) should have applied and, thus, he should have received no more than the three-level enhancement found in subsection (b).

A district court may apply the four-level enhancement even if the defendant's criminal activity involved fewer than five people, so long as the defendant's participation was "otherwise extensive." *United States v. Hall*, 996 F.2d 284, 287 (11th Cir. 1993). This answers Benavides' first contention. Yet he attempts to undermine the district court's decision by citing *United States v. Alred*, 144 F.3d 1405 (11th Cir. 1998), and by claiming that the "criminal activity" the defendant organizes has a direct link to the number of participants in the scheme.

But Benavides misplaces his reliance on *Alred*: that case involved a drug dealer with extensive involvement as a *buyer and seller* of drugs, not as a *leader or organizer* of the enterprise. Benavides does not dispute that he had a leadership

position over Ruiz. And this admission takes his case outside *Alred*'s reach. The

Commentary to the *Sentencing Guidelines*, moreover, flatly contradicts his claim

that he had to organize or lead five or more people for subsection (a) to apply. *See*

U.S.S.G. § 3B1.1(a) cmt. n.3 ("In assessing whether an organization is 'otherwise

extensive,' all persons involved during the course of the entire offense are to be

considered. Thus, a fraud that involved only three participants but used the

unknowing services of many outsiders could be considered extensive."). Either

way, the district court correctly found that more than five people—Benavides,

Guerra, Ruiz, Suleidy Cano, Abner Diaz, and "the lawyer," Benjamin

Metsch—were involved with Lily.

Benavides' second argument hinges on the differences in grammatical

structure between §§ 3B1.1(a) and (b). Together, the two subsections read as

follows:

> Based on the defendant's role in the offense, increase the
> offense level as follows:
>
>> (a) If the defendant was an organizer or
>> leader of a criminal activity that involved
>> five or more participants or was otherwise
>> extensive, increase by 4 levels.
>>
>> (b) If the defendant was a manger or
>> supervisor (but not an organizer or leader)
>> and the criminal activity involved five or
>> more participants or was otherwise

extensive, increase by 3 levels.

U.S.S.G. §§ 3B1.1(a), (b). Benavides claims that because the second hanging sentence uses the conjunction "and" to separate its first two clauses, the defendant need not have direct control over all five culpable participants for the enhancement to apply. Conversely, the first hanging sentence does not use "and" to separate its two clauses, which, according to Benavides, makes the numerosity requirement apply to both the criminal activity as a whole and to the phrase "organizer or leader."

It is true enough the two sections use different phrasing. But while § 3B1.1(b) uses "and" to separate its first two clauses, § 3B1.1(a) achieves the same effect by using the relative pronoun "that." Indeed, the word "that" stands in place of the noun immediately preceding it, which, in this case, is "activity." Applying this grammar and usage rule, the second clause in § 3B1.1(a) only requires that the criminal activity involved five or more people. It does not, as Benavides claims, modify the entire "organizer or leader" clause to require direct authority over those other people.[9] Benavides' linguistic argument thus fails, and the district court's

---

[9] To put it more simply, Benavides wants the court to read subsection (a) once and then again—the second time with an ellipses so as to require the defendant to be "an organizer or leader of . . . five or more participants" before the district court can impose the four-level enhancement. As explained above, this would violate well-established grammatical and usage rules.

decision to apply the four-level enhancement is affirmed.

## V. CONCLUSION

After his conviction, Yasmanny Benavides loosed a variety of claims of error and asserted that the district court improperly applied the "organizer or leader" enhancement to his sentence. As we have explained, the district court stayed within the bounds of its discretion and properly applied the disputed enhancement to Benavides' sentence. Accordingly, we AFFIRM both his conviction and sentence.

MARTIN, Circuit Judge, Concurring:

Although I agree with the panel that Mr. Benavides's conviction is due to be affirmed, I write separately because I believe the district court judge erred in her application of Federal Rule of Evidence 609 to Mr. Benavides's questioning of Erich Ruiz.

Having been called to testify by the government, Ruiz admitted that he had been arrested for participating in an illegal Internet pharmacy scheme. When counsel for Mr. Benavides sought to cross-examine Ruiz about a second set of charges stemming from the same incident, Ruiz claimed that those charges resulted only from his work for a pharmacist whose license had expired. The truth was far more serious, insofar as Ruiz had been charged with forging prescriptions and selling drugs without a prescription. Knowing this, Mr. Benavides's counsel followed up, asking, "[w]ell, the first set of charges were [sic] selling drugs without a prescription. Right?" The prosecutor objected to the question, citing Rule 609. And the district court limited Mr. Benavides's counsel "to bring[ing] up the fact that [Ruiz] has a prior conviction."

The majority opinion affirms the district court on this issue, relying on an evidentiary rule that was not mentioned here or before the district court. The panel

31

majority reads this exchange to "f[all] outside the ambit of Rule 609," Op. 19, because it was not being introduced to attack Ruiz's "<u>character</u> for truthfulness." Fed. R. Evid. 609(a)(2) (emphasis added). Specifically, the majority says that Ruiz's prior conviction was not being used to impeach his "credibility by showing that he had committed a crime involving dishonesty, but instead to show that [another prosecution witness] had taught Ruiz how to commit fraud." Op. 18–19. Based on this, the panel opinion concludes that the prior conviction evidence was properly excluded under Rule 404(b), which would bar the evidence if it were being used to "to prove [Ruiz's bad] <u>character</u>," Fed. R. Evid. 404(b)(1) (emphasis added). Op. 18.

This analysis is puzzling to me. If it is true that Ruiz's prior conviction evidence was being used to demonstrate a history of collaboration between Ruiz and "the Government's star witness against Benavides," Op. 2, then how, at the same time, is it correct to conclude that the evidence was rightly excluded because it was being used to prove Ruiz's character? Beyond that, I do not see how Rule 404(b) could apply, given that defense counsel brought up this fact during cross-examination of a prosecution witness. See <u>United States v. Morano</u>, 697 F.2d 923, 926 (11th Cir. 1983) ("Rule 404(b) does not specifically apply to exclude . . . evidence [that] involves an extraneous offense committed by someone other than

32

the defendant [because] the evidence was not introduced to show that the defendant has a criminal disposition . . . so the policies underlying Rule 404(b) are inapplicable."); see also United States v. Farmer, 923 F.2d 1557, 1567 (11th Cir. 1991) ("The witness's motive to testify falsely is merely an aspect of credibility controlled by Fed. R. Evid. 608. Motive in the context of Rule 404(b) refers to the motive for the commission of the crime charged.") (quotations marks and alterations omitted) (quoting United States v. Sampol, 636 F.2d 621, 659 n.24 (D.C. Cir. 1980).

I think what happened is that the district court misapplied Rule 609, limiting the cross-examination of Ruiz too strictly. Mr. Benavides's counsel asked Ruiz whether the charges brought against him had been for forging drug prescriptions, which is a crime involving dishonesty. Counsel presumably believed that the nature of that particular offense gave the jury an additional reason to question Ruiz's veracity, and thus to disbelieve his testimony.

Plainly, Rule 609 requires the district court to admit the question raised by Mr. Benavides's counsel. See Fed. R. Evid. 609(a)(2) "[E]vidence must be admitted" where a prior crime involved "a dishonest act or false statement."); United States v. Burston, 159 F.3d 1328, 1336 (11th Cir. 1998) (holding that the district court abused its discretion by not admitting "evidence of the nature and

number of a non-defendant witness's prior felony convictions").

The district court was correct that there is some limit to how far counsel can delve into the underlying facts of a conviction under Rule 609. Cf. United States v. Tumblin, 551 F.2d 1001, 1004 (5th Cir. 1977) (holding that the prosecutor "exceeded a reasonable scope of questioning" when his inquiries began suggesting that the "defendant was a man who had spent most of his young life committing and serving time for crimes, rather than being gainfully employed").[1]  But, wherever that limit may fall, counsel for Mr. Benavides did not reach it here, simply by getting at the dishonest nature of the offense for which Ruiz had been convicted.

In drawing the Rule 609 line too soon, the district court prevented counsel from getting an answer to the basic question of whether Ruiz had been charged for the particular offense of forging prescriptions. In so doing, the district court deprived Mr. Benavides of a powerful basis for impeaching a critical witness against him. Thus, in my view, the district court abused its discretion when it construed Rule 609 to limit Mr. Benavides's cross-examination of Ruiz only to "bring[ing] up the fact that [Ruiz] has a prior conviction." See United States v.

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding all Fifth Circuit precedent prior to October 1, 1981.

Frazier, 387 F.3d 1244, 1276 (11th Cir. 2004) (stating that a "trial court abuses its discretion in making an evidentiary ruling if it misapplies the law.") (quotation marks omitted). Nevertheless, for the same reasons given in the panel's treatment of Mr. Benavides's prosecutorial misconduct claim, I find this error harmless.