[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14283

_____

D.C. Docket No. 1:15-cr-00031-DHB-BKE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAMIEN BERNARD OSBORNE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(January 4, 2017)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and JOSE MARTINEZ,[*] District Judge.

PER CURIAM:

Appellant Damien Bernard Osborne challenges his conviction for armed bank robbery, following a three-day jury trial. He raises arguments that the district court improperly admitted two categories of evidence: (1) text messages between a cell-phone number attributed to Osborne and other numbers, and (2) summary exhibits concerning the text messages. We have carefully reviewed the record and the parties' briefs, and we have heard oral argument. Because we find no reversible error, we now affirm Osborne's conviction.

## I.

### A.  The Trial

On March 4, 2015, a federal grand jury in the Southern District of Georgia indicted Osborne on two counts: armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d); and using, carrying, and branding a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). The court held a three-day jury trial on the charges. During the trial, the following evidence was presented.

---

[*] The Honorable José Martínez, United States District Judge for the Southern District of Florida, sitting by designation.

## 1.  The Bank Robbery

On December 2, 2013 at 11 a.m., two masked armed men in hoodies and wearing gloves entered the front door of Southern Bank, a bank insured by the Federal Deposit Insurance Corporation.  They grabbed several bank employees, pointed guns at them, and threatened to kill them if the employees did not comply with the robbers' demands.  The men yelled at everyone to lie down on the floor in the bank lobby.  Then they threatened a bank teller to "give them the money," so she did.

Cash that the robbers took was bound by "bill straps" (money wrappers) stamped with the words "Southern Bank."  The wrappers on each stack of cash bore the bank's name, the teller's number and initials, and the date that the teller had wrapped the money.  The robbers stole a total of $10,980 from Southern Bank.

## 2. The Post-Robbery Events

In the aftermath of the robbery, witnesses observed the robbers drive away in a black BMW.  The black BMW stopped at the "Lovett house," where Melvin Jones saw three men walk away from it after parking it in the backyard of the house.  Jones observed the three men enter the screened-in back porch area of the house next door to the Lovett house.  Later, Jones saw the men leave in a different, light-colored car.

Later that same day, Willie McKelton, who lives next door to the Lovett house, discovered that his porch was not as he had left it.  On his porch, McKelton found money wrappers.  McKelton had heard about the bank robbery earlier in the day from conversations on "social media" and people talking "in the break room" where he worked, so McKelton reported his findings to the police.

### 3.  The Investigation

The Georgia Bureau of Investigation investigated the scene at the Lovett house and McKelton's home.  They found fingerprints on two of the money wrappers, another piece of paper, and possibly a napkin.

James Gordon, a retired sergeant with the Richmond County Sheriff's office, identified two of the fingerprints on the money wrappers as those of Damien Osborne.  These wrappers had the Southern Bank logo on them, the bank teller's number and initials, and the dates of November 25, 2013, and December 2, 2013.  Sergeant Thomas Johnson, an officer with the Richmond County Sheriff's office, likewise identified the prints as those of Osborne.

Investigators also processed the black BMW they found at the Lovett house Inside the car, they found a $10 bill, a receipt from Check Exchange Number 2 with the name "Damien Osborne" printed on it, and a piece of cardboard used to package a pair of gloves.

Danette Spears, the manager of the Check Exchange location identified on the receipt found in the black BMW, testified that Osborne had opened an account to cash checks there. Spears explained that Osborne's personal information was taken at the time he opened his accounts, and Osborne's account application was admitted into evidence. In the application, Osborne listed his telephone number as (706) 831-4017.

Bernard Osborne, Damien Osborne's father, testified that his son called him on December 2, 2013, to ask him if he could leave his car at the Lovett house, which belonged to Bernard Osborne's deceased grandfather.

The Federal Bureau of Investigation ("FBI") also got in on the action. FBI Special Agent Paul Kubala learned that a black BMW matching the description of the one involved in the robbery had been recovered and that it was registered to Dianne Davis. Dianne Davis told Kubala that the vehicle belonged to her son, William Davis, who was incarcerated at the time and had loaned the car to a man named "Slick." Kubala obtained Slick's phone number from Dianne Davis and went to Rhinehart's Oyster Bar, where, according to Dianne Davis, Slick worked. At Rhinehart's, Esha Tankersley immediately identified "Slick" as her employee Damien Osborne. She also told Kubala that Osborne drove a black BMW and that he had abruptly stopped showing up for work on November 24, 2013.

5

William Davis confirmed that he had lent his black BMW to Osborne upon William Davis's imprisonment.  He denied having placed the receipt bearing Osborne's name or the glove packaging inside the BMW.  In addition, William Davis noted that the name and phone number for Slick provided to Kubala by Dianne Davis were written in his mother's handwriting, and the paper looked like it came out of his mother's address book.  William Davis explained that he told his mother that Slick would have his black BMW, and he told her how to get in touch with Slick.

### 4.  Phone Records and Text Message Evidence Admitted at Trial

Jasmine Tell, a records custodian from Verizon Wireless, testified regarding text messages and phone calls made from the telephone numbers (706) 825-6858 ("6858") and (706) 831-4017 ("4017").  She stated that (1) the records Verizon produced in the case were made at or near the time of the events described; (2) the records were kept in the regular course of business; and (3) it was a regular practice of the business to make the records.  Tell also testified that phone number 6858 was activated on November 27, 2013, just a few days before the December 2, 2013, robbery at Southern Bank.

The government presented summary documents containing the text messages.  Tell ensured that the listed dates, times, and designation of the text messages as incoming or outgoing on these summary documents were accurate and

corresponded with Verizon's source material containing the summarized information.

Osborne objected to the government's introduction and use of the summary documents, arguing that the exhibits did not satisfy the requirements of Rule 1006 of the Federal Rules of Evidence because they were not voluminous. In response, the government took the position that despite the length of the records, they nonetheless qualified as admissible summaries because they organized records not otherwise clearly decipherable by the jury, and it noted that the source documents were attached. The court admitted the exhibits but gave a limiting instruction regarding the jury's use of the summary documents, explaining to the jury the difference between the actual records as "source evidence" and the summary documents and testimony.

Osborne also objected to the content of the text-message evidence from the 6858 and 4017 phones on the basis of "hearsay within hearsay."[1] The government responded, asserting that the evidence was not hearsay because, among other reasons, it was admissible under the business-records exception. Significantly, Osborne replied that he made his hearsay-within-hearsay objection to only "the substance of the communications ***not allegedly authored by the defendant***."

---

[1] Osborne did not object to Tell's testimony on the basis that the government had not established the relevance of the text messages because it had not proved that Osborne owned or used those phones.

(emphasis added).   Instead, Osborne clarified, he objected to the incoming text messages of the "third parties."   The court admitted both the incoming and outgoing text messages because it concluded that "[h]alf of a conversation would be meaningless and would likely be unintelligible."

Exhibit 89C-3 showed text messages between 6858 and (706) 373-3107 on December 2, 2013, at 7:34 a.m.:

> Outgoing [from 6858]: U up?
>
> Incoming: yeah
>
> Outgoing: Cum thur lets go
>
> Incoming: come where bra
>
> Outgoing: My house
>
> Incoming: give me a min bra
>
> Outgoing: Bra lets get it
>
> Incoming: ight bra

Exhibit 89C-2 included text messages on the same day at 7:45 a.m., between 6858 and (706) 461-9515, in which the user of 6858 identified himself as "Slick":

> Outgoing [from 6858]: Whats popn 5?
>
> Incoming: who dis b
>
> Outgoing: Slick fool hit me

8

Exhibit 89D consisted of actual Verizon records of one text message that was received by 4017 on November 26, 2013. The incoming, third-party text message identified Slick as the individual using the 4017 phone number at the time, stating in pertinent part, "[s]ayn you known for doin it that's y ya name Slick."

Exhibit 89G, which Tell testified was a summary exhibit showing the quantity of incoming and outgoing calls from numbers 6858 and 4017, was also admitted into evidence at the trial. Tell testified that on November 26, 2013, number 4017 participated in 199 calls and texts. Number 6858 was activated on November 2, 2013, and, when the quantity of texts and phone calls from 4017 decreased, the number of texts and calls from 6858 increased. On December 2, 2013, 4017 made one call or sent one text, and 6858 participated in 296 calls and texts.

And although Exhibit 89C-l was not discussed at trial, this admitted exhibit shows a conversation between a third party and 6858, which identifies "Damien" as the 6858 phone's user: "Damien ugly how the hell u gone put me on hold don't come back to the phone that s rude and inconsiderate this exactly why we can never get along."

9

### 5.  Cell-Phone Tower/"Ping" Evidence

Finally, the government presented evidence showing that immediately after the Southern Bank robbery, 6858 used a cell tower that covered the location of Southern Bank, and between 11:21 a.m. and 12:45 p.m., 6858 used a cell tower that covered the location of the Lovett house.  Osborne did not object to this evidence.

### B.  The Verdict and Sentence

At the close of the evidence, the jury returned a guilty verdict on both counts.  The district court sentenced Osborne to 155 months in prison (71 months as to Count 1 and 84 months as to Count 2, to be served consecutively).  Osborne now appeals his conviction, challenging the admission of both incoming and outgoing text messages and the summary exhibits.

## II.

We generally review a district court's evidentiary rulings for abuse of discretion.  *United States v. Massey*, 89 F.3d 1433, 1441 (11th Cir. 1996).  But where a party failed to object at trial, we review the district court's decision for plain error only.  *See* Fed. R. Crim. P. 52(b); *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003).  Under the plain-error standard, an appellant must show that (1) an error occurred; (2) the error was plain; and (3) the error affected the appellant's substantial rights.  *United States v. Shelton*, 400 F.3d 1325, 1328-29

(11th Cir. 2005).  Only if all three requirements are satisfied may we exercise our discretion to "notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (citations and internal quotation marks omitted).

### A.

We begin by addressing Osborne's argument that the district court committed reversible error in admitting the text messages.  In the district court, Osborne objected to the admissibility of the incoming text messages only, not the outgoing ones.  But as we have noted, on appeal, Osborne challenges the admission of both the incoming and outgoing text messages.  Because Osborne raises his objection to the outgoing text messages for the first time on appeal, we review this aspect of his claim for plain error.

Here, Osborne asserts that the district court could not have properly admitted the outgoing text messages under the business-record exception to the hearsay rule. *See* Fed. R. Evid. 803(6).  Rule 803(6) excepts from the hearsay rule "records of a regularly conducted activity."  To qualify for this exception, the proponent of the evidence must establish the following:

> (A)  the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B)  the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

11

(C)    making the record was a regular practice of that activity;

(D)    all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and

(E)    the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

*Id.* Osborne essentially argues that the content of the outgoing text messages is hearsay because Verizon did not have knowledge of the information contained within the content of the outgoing text messages, and it lacked adequate verification or other assurance of accuracy of the information. The government responds that the Verizon documents qualify as business records because, based on the Verizon representative's testimony, they reliably report the content of the text messages they document, and that is all that was at issue.

Osborne bases his argument on *United States v. Blechman*, 657 F.3d 1052 (10th Cir. 2011). There, the Tenth Circuit considered whether information appearing in an alleged business record but provided by an outsider to the business who is not under a business duty to provide accurate information may ever be excepted from the hearsay rule under Rule 803(6). *See id.* at 1065-66. It concluded that such information may qualify for admission under Rule 803(6) "[i]f the business entity has adequate verification or other assurance of accuracy of the information provided by the outside person." *Id.* at 1066 (citation and internal quotation marks omitted). In particular, the Tenth Circuit noted two methods of

12

demonstrating the requisite "guarantee of trustworthiness":  "(1) proof that the business has a policy of verifying [the accuracy of information provided by someone outside the business]; or (2) proof that the business possesses 'a sufficient self-interest in the accuracy of the [record]' to justify an inference of trustworthiness."  *Id.* (citation and internal quotation marks omitted) (alteration in original).

We have previously explained that "at least where the explicit language of a . . . rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).  As the *Blechman* discussion illustrates, the explicit language of Rule 803(6) does not specifically resolve the question of whether the content of text messages is admissible under the rule in the circumstances of this case.  And Osborne's reliance on a Tenth Circuit case to make his argument is an implicit concession that he has found no Supreme Court or Eleventh Circuit case that directly resolves the issue.  Nor have we.  For these reasons, even assuming *arguendo* that the district court's admission of the outgoing text messages was error, it did not constitute plain error.

And even if it had been plain error, in this case, the admission of the outgoing texts did not affect Osborne's substantial rights.  To show that an error

13

affected Osborne's substantial rights, Osborne had to demonstrate that the error "affected the outcome of the district court proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citation and quotation marks omitted).

Here, he could not do that. The evidence in this case was overwhelming, even in the absence of the content of the text messages. William Davis testified that he lent the black BMW—the robbery get-away car—to Osborne when Davis went to jail; Tankersley similarly attested that Davis drove a black BMW and stopped showing up for work shortly before the robbery; the black BMW was found at the Lovett house, which was owned by Osborne's family; a receipt with Osborne's name, along with packaging for gloves (such as those used during the robbery), was found inside the black BMW; Southern Bank money wrappers dated within a day and about a week of the robbery and bearing Osborne's fingerprints were found on the porch of the home next to the Lovett house; and the 6858 number, which started being used only when the 4017 number—which Osborne identified as his own on the unobjected-to Check Exchange application—decreased in usage, was used in the vicinity of the robbed bank just after the robbery and in the area of the Lovett house soon thereafter. Against this evidence, the limited content of the outgoing text messages could not reasonably be viewed as having had any substantial effect on the jury's determination of guilt.

14

Nor does Osborne fare any better on his challenge to the admission of the incoming messages.  Though we review this district-court decision for abuse of discretion, we find none.

In *United States* v. *Rivera,* 780 F.3d 1084 (11th Cir. 2015), we recently noted that "where the admission of the substance of a communication between the defendant and another person is sought, the fact that the statements made by the other person were out of court does not, as a blanket matter, preclude admission." *Id.* at 1093.  Under *Rivera*, statements from a non-defendant are admissible to give context to the defendant's alleged statements when the non-defendant's statements were also non-hearsay because they were "non-assertive statements that are incapable of being true or false or . . . statements that are indisputably false." *Id.* at 1092.

In Osborne's case, the district court admitted several incoming text messages that fit *Rivera*'s framework for admissible, third-party, non-assertive statements that give context to the defendant's alleged statements:  Exhibit 89C-3, for example, shows four incoming texts: (1) "yeah;" (2) "come where bra;" (3) "give me a min bra;" and (4) "ight bra."  These statements, as the district court explained, give context to Osborne's outgoing text messages, and they were not admitted for the truth of the matter asserted—particularly because they do not really assert anything. *See Rivera,* 780 F.3d at 1092.  In Exhibit 89C-2, also, the

15

only incoming text is a question—"who dis b"—which is also not an assertive statement, and which gives context to Osborne's alleged response identifying himself.

In Exhibit 89C-1, the declarant calls the owner of the 6858 phone by the name "Damien," thus purporting to identify the recipient of the message. Exhibit 89C-1 was also presented alone, as only one incoming message without any outgoing messages, so it is not admissible in order to place any of Osborne's statements into context.

Nevertheless, we need not decide whether this text message constituted inadmissible hearsay because even if it did, the court's admission of the message was harmless error. When, as alleged here, nonconstitutional error occurs in criminal cases, "we apply the federal harmless-error statute, which provides that on appeal we must ignore 'errors or defects which do not affect the substantial rights of the parties.'" *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999) (quoting 28 U.S.C. § 2111).

As we have explained, in the absence of the text messages, the evidence of Osborne's guilt was plentiful and strong. So even the omission of all of the text messages would have been highly unlikely to have produced a different verdict, and an improper admission by the district court does not warrant reversal unless "[a] significant possibility . . . exist[s] that, considering the other evidence

16

presented by both the prosecution and the defense, the . . . statement had a substantial impact upon the verdict of the jury." *See United States v. Arbolaez*, 450 F.3d 1283, 1290 (11th Cir. 2006) (quoting *United States v. Rodriguez*, 524 F.2d 485, 487 (5th Cir. 1975)).  Since that is not the case here, the admission of the incoming texts—even if erroneous—cannot provide grounds for a reversal of Osborne's conviction.

**B.**

Osborne also contends that the district court committed reversible error in admitting Government Exhibits 89C-l, 89C-2, and 89C-3 under Rule 1006, Fed. R. Evid.  As we have noted, these exhibits summarized the information contained on the Verizon records setting forth the text messages sent to and from phone numbers 6858 and 4017.  In explaining the basis for his challenge, Osborne argues that "a single incoming text message consisting of 29 words does not constitute 'voluminous writings' to warrant its separate admission as summary exhibit 89C-3.  Likewise, the three text messages in summary exhibit 89C-2, which totaled 32 characters, are not voluminous."  Because the district court allowed the text messages in the form of summary exhibits, Osborne argues, it "bolstered their significance to the jury and thereby harmed Mr. Osborne."

17

We review a district court's decision to admit summary charts under Rule 1006 for abuse of discretion. *United States v. Richardson*, 233 F.3d 1285, 1293 (11th Cir. 2000).

Rule 1006 states, in relevant part, that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs *that cannot be conveniently examined in court.*"  Fed. R. Evid. 1006 (emphasis added).  Though we have noted that summary charts have potential for abuse, we have also explained that summary exhibits are permissible so long as they are supported by the record, the supporting evidence has been presented to the jury, and the court informs the jury that it has the responsibility to decide what weight to give the summaries. *Richardson*, 233 F.3d at 1293-94.  We have further reasoned that "where the defense has the opportunity to cross-examine a witness concerning the disputed issue and to present its own version of the case, 'the likelihood of any error in admitting summary evidence diminishes.'"  *Id.* (citation and internal quotation marks omitted).  Applying these standards, we find no abuse of discretion in the admission of the summary exhibits.

First, the exhibits were supported by the record, the supporting evidence was presented to the jury (and, in fact, included with the summary exhibits), and the court properly instructed the jury on the role of the summary exhibits, explaining

18

that the jury could rely on them only to the extent that it found them helpful but that the summaries should not replace the source evidence.

Second, though the source documents were not lengthy—about ten pages—the information they contained was nonetheless "voluminous." Indeed, we agree with the government's description of the source documents as "complicated[] and disorganized," in that they contained only a very few text messages scattered amongst vast "fields of information" that would be "virtually incomprehensible to a lay person." For this reason—as the government explained and, after examining the source documents, we can see why—locating and organizing the messages within Verizon's technical records could not have "be[en] done conveniently" from the witness stand in the absence of the summary exhibits. As a result, the summary exhibits made voluminous information much more easily accessible and understandable to the jury.

Third, Osborne had the opportunity to, and did, in fact, thoroughly cross-examine Verizon's records custodian regarding the summary exhibits. On this record, we find no abuse of discretion in the district court's admission of the summary exhibits.

### III.

For the foregoing reasons, Osborne's conviction is **AFFIRMED.**

19