[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 22-10783

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ELVIN I. LEWIS, JR.,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cr-60034-RKA-1

————————————————

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

A grand jury in the Southern District of Florida indicted Elvin Lewis for one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and ten counts of the substantive offense of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The charges stemmed from his role in a "business email compromise" scheme (BEC).[1]

Mr. Lewis pled not guilty, and the case proceeded to trial. The government's theory of the case was that (1) Mr. Lewis received money from businesses which received fraudulent emails as part of the BEC scheme; (2) Mr. Lewis would then transfer the funds between his own bank accounts and that of his accomplice, and finally to an account overseas; and (3) Mr. Lewis did so as part of a conspiracy to launder the fraudulently obtained funds for an unknown individual in China, while keeping a percentage of the funds as payment for his role.

Through witness testimony and voluminous documentary evidence—such as business records from the victim business, phone records demonstrating communications between Mr. Lewis and his co-conspirators, and bank records showing the transfer of

---

[1] A business email compromise scheme is one where scammers hack into the employee emails of a legitimate company to cause the unauthorized transfer of funds or the disclosure of confidential information.

funds to and from Mr. Lewis' accounts and to his co-conspirator's accounts—the government presented evidence of the BEC scheme and Mr. Lewis' involvement. The government also introduced several summary charts depicting key events in the BEC scheme and the money laundering conspiracy.

After a 5-day trial, the jury found Mr. Lewis guilty on all counts. The district court sentenced him to 151 months of imprisonment, at the top of the applicable advisory guideline range.

Mr. Lewis now appeals his convictions and sentence. He argues that the district court plainly erred by admitting the government's summary exhibits and by failing to provide limiting instructions to the jury regarding their use. He also argues that the district court imposed a substantively unreasonable sentence when it considered his lack of remorse in determining his sentence. After reviewing the parties' briefs and the record, we affirm.

**I**

We first address Mr. Lewis' arguments that the admission of the government's summary exhibits and the district court's failure to provide limiting instructions as to their use constituted reversible error. Because Mr. Lewis did not object to the admissibility of the exhibits or the jury instructions at trial, we review both of his challenges for plain error. *See United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019) (failure to object to the admissibility of evidence resulted in plain error review); *United States v. Iriele*, 977 F.3d 1155, 1177 (11th Cir. 2020) (failure to object to jury instructions resulted in plain error review). We will only reverse for plain error if

Mr. Lewis can first show that the district court committed error that was plain and that affected his substantial rights. *See Hawkins*, 934 F.3d at 1264.

## II

Under Federal Rule of Evidence 1006, a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Summary evidence is generally permitted, and it is within the district court's discretion to admit summary evidence at trial. *See United States v. Richardson,* 233 F.3d 1285, 1293 (11th Cir. 2000). Nevertheless, the district courts must ensure that a defendant "is not unjustly convicted in a trial by charts." *Id.* (internal quotation marks omitted).

Summary evidence need not "be free from reliance on any assumptions." *See id.* at 1294 (quoting *United States v. Diez,* 515 F.2d 892, 905 (5th Cir.1975)). Instead, district courts have wide discretion to admit summary evidence incorporating certain assumptions so long as there is evidence in the record to support them, the supporting evidence has been previously presented to the jury, and the district court makes clear "that the ultimate decision should be made by the jury as to what weight should be given to the evidence." *See id.* (internal quotation marks omitted).

## A

At trial, the government introduced various flow charts that summarized key aspects of the BEC scheme and the money laundering conspiracy. The charts in large part diagramed (1) the flow

22-10783                Opinion of the Court                5

of funds from the company victims to accounts controlled by Mr. Lewis and his co-conspirators;  (2) the types of transactions made in Mr. Lewis' accounts and the dollar amounts and percentages composing each type of transaction; and (3) relevant timelines chronicling (a) communications between the company victims and the BEC scammers, (b) the wire transfers sent from the company victims to Mr. Lewis' account, (c) communications between Mr. Lewis and his co-conspirators, and (d) other key information, such as when Mr. Lewis opened and closed the accounts linked to the conspiracy and the number of text messages exchanged between Mr. Lewis and his co-conspirators.

On appeal, Mr. Lewis argues that the summary charts were improperly admitted under Rule 1006 because they contained "markings, headers, highlights, and legal conclusions" that were not in the original business records. *See* Appellant's Br. at 15–16. He also challenges the government's use of descriptive labels "BEC Victim Payments" and "Summary of Fraudulent Emails." *See id.* at 9, 12.  His arguments fail, however, because he has not shown plain error. [2]

---

[2] Mr. Lewis purports to challenge the admissibility of many of the government's non-summary exhibits.  One of the exhibits consists of a demonstrative aid that was not used as evidence at trial and the others largely consist of original records or composite exhibits containing extracts from original records. But he has only challenged the government's exhibits on the ground that they constituted improper summary evidence under Rule 1006.  These other exhibits do not constitute "chart[s], summar[ies], or calculation[s]" of other evidence, as contemplated by Rule 1006.  Because Mr. Lewis has not properly raised the issue of whether the district court plainly erred by admitting the

**B**

As an initial matter, we reject Mr. Lewis' contention that Rule 1006 requires that the summary evidence be "unaltered" and thus free from any highlighting or notations "not in the original records." *See* Appellant's Br. at 15–17. The plain terms of Rule 1006 do not impose this requirement, nor does Mr. Lewis cite to any case law indicating any such requirement. *See generally* Fed. R. Evid. 1006. We therefore see no plain error in the district court admitting summary exhibits on the basis that they contained yellow highlighting, bolding, and other markings not in the original records. *See United States v. Innocent*, 977 F.3d 1077, 1081 (11th Cir. 2020) ("An error is plain if . . . the explicit language of a statute or rule or precedent from the Supreme Court or this Court directly resolv[es] the issue.") (internal quotation marks and citations omitted) (alteration in original).

We also conclude that the district court did not plainly err by admitting the disputed charts because they were admitted in conformity with *Richardson*, 233 F.3d at 1294.

First, the information contained in the charts was derived directly from the original records admitted at trial. The record shows that the government introduced—without objection from Mr.

___

non-summary exhibits, he has abandoned any challenges as to those exhibits. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

Lewis—correspondence from the victim companies showing the fraudulent wire requests; financial records showing the wire transfers made from the companies to Mr. Lewis' account and from his account to accounts controlled by his co-conspirators; bank statements detailing the transactional activities in Mr. Lewis' accounts during the relevant time period; and extensive phone records, including texts and WhatsApp messages between Mr. Lewis and his co-conspirators discussing details of the money laundering conspiracy. This evidence formed the basis of the summary charts. *See, e.g.*, D.E. 146 at 159–61 (government expert identifying the bank records already admitted in evidence that he reviewed to create summary charts showing flow of funds); *id.* at 266–67 (government agent confirming that he prepared summary charts from information captured in Mr. Lewis' WhatsApp pen register, which was admitted into evidence).

Second, the two descriptive labels were supported by evidence previously presented to the jury. Before the government introduced the charts with the labels "BEC Victim Payments"—used to describe the wire transfers that the companies made to Mr. Lewis' account—and "Summary of Fraudulent Emails"—used to describe a summary timeline of the BEC scheme—the government introduced the underlying email communications and bank records on which the charts and labels were based.

Third, the jury heard testimony from witnesses representing the injured companies who testified to being victims of the BEC scheme. Their testimony included discussions of the contents of

the fraudulent emails, the company servers that were hacked to send the fraudulent emails, and the payments that were unknowingly sent to Mr. Lewis' account. This testimony—which the jury heard before the charts were discussed—amply supports the use of the labels "BEC Victim Payments" and "Summary of Fraudulent Emails."

Finally, the jury was generally instructed on the weight to give the summary evidence. At the beginning of the trial, the district court instructed the jury to "give every piece of evidence whatever weight you think it deserves." *See* D.E. 143 at 173. It later instructed the jury at the close of arguments that it may use the government summary charts as evidence and that, though it "must consider all the evidence," it did not need to accept "all the evidence as true or accurate." *See* D.E. 147 at 84, 86. These instructions are consistent with the teachings of *Richardson* "that the ultimate decision should be made by the jury as to what weight should be given to the evidence." *See Richardson*, 233 F.3d at 1293.

## C

Mr. Lewis contends that the district court's instructions were insufficient because they failed to provide any limitations on how the jury should assess the summary charts. In support, he relies on *Richardson* and an unpublished case, *United States v. Osborne*, 677 Fed. Appx. 648 (11th Cir. 2014), and notes that in those cases, the district court both admitted the government's summary charts and gave limiting instructions to the jury regarding their use. He

22-10783               Opinion of the Court                    9

argues, therefore, that the district court erred in admitting the summary charts here because it failed to follow the same procedure.

We are unpersuaded for two reasons.  First, in both cases, the defendants objected to the summary exhibits, which Mr. Lewis did not do here.  *See Richardson*, 233 F.3d at 1293; *Osborne*, 677 Fed. Appx. at 656.  Second, under *Richardson* the district court is only required to instruct the jury that the decision as to what weight to give the summary evidence is theirs to make.  *See Richardson*, 233 F.3d at 1293.  The district court did that here when it charged the jury to "give every piece of evidence whatever weight you think it deserves"—"every piece of evidence" necessarily includes the government's summary charts.  *See* D.E. 143 at 173.  Mr. Lewis' challenge with respect to the jury instructions therefore fails under plain error review.

### D

Even if we were to conclude that the summary evidence was improperly admitted, Mr. Lewis has failed to demonstrate how he was prejudiced by the error.

Mr. Lewis argues that because he was unable to "cross examine the charts nor contest the conclusions contained and/or implied in them" the admission of the charts violated his Sixth Amendment right to confront the witnesses against him.  *See* Appellant's Br. at 19.  His argument is misguided.

The summary charts were created from non-testimonial records and therefore do not implicate the Confrontation Clause of the Sixth Amendment.  *See Crawford v. Washington*, 541 U.S. 36,

56 (2004) (noting that business records are not testimonial); *United States v. Naranjo*, 634 F.3d 1198, 1214 (11th Cir. 2011) ("Summary evidence also is not testimonial if the evidence underlying the summary is not testimonial."). In addition, Mr. Lewis had the opportunity to object to the underlying records, to cross-examine the witnesses who created the summary charts, and to contest any labels or conclusion contained in the charts. The likelihood of any error was therefore reduced. *See Richardson*, 233 F.3d at 129 ("[W]here the defense has the opportunity to cross-examine a witness concerning the disputed issue and to present its own version of the case, the likelihood of any error in admitting summary evidence diminishes.") (internal quotation marks omitted).

Further, Mr. Lewis cannot otherwise show that he was prejudiced by the labels "BEC Victim Payments" and "Summary of Fraudulent Emails" because he at no point disputed the conclusions underlying them. Specifically, he did not dispute that certain companies were tricked into wiring funds to his account as part of the BEC scheme nor that certain company emails were compromised in order to redivert funds to his account. Rather, from the outset of the trial, his counsel told the jury that Mr. Lewis did "not disput[e] any of the evidence" that the government had as to the existence of the BEC scheme and that he agreed that "a crime ha[d] been committed." *See* D.E. 143 at 198. He further conceded that the government had "mountains of evidence" proving the BEC scam, and only disputed that he had "any knowledge of th[e] scam." *See id.* at 198–99.

Because Mr. Lewis has failed to show plain error as to the admissibility of the summary charts or the district court's instructions regarding their use, we affirm the admission of the disputed charts into evidence.

## III

We next address Mr. Lewis' argument that the district court erred when it considered his lack of remorse in fashioning his sentence. [3]

## A

We review a sentence for reasonableness under an abuse of discretion standard, considering the totality of the circumstances. *See Irey*, 612 F.3d at 1189. "We ordinarily expect a sentence within the [advisory] Guidelines range to be reasonable, and the party challenging the sentence bears the burden of establishing that the sentence is unreasonable according to the facts of the case and the § 3553(a) factors. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

A district court abuses its discretion and imposes a substantively unreasonable sentence when it "(1) fails to afford

---

[3] Mr. Lewis does not specify whether he challenges the procedural or substantive reasonableness of his sentence. We construe his argument that the district court improperly considered his lack of remorse when imposing his sentence as a challenge to the substantive reasonableness of his sentence. *See United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (providing that a sentence is substantively unreasonable, in part, if the district court "gives significant weight to an improper or irrelevant factor").

consideration to relevant [§ 3553(a)] factors that were due signifi-cant weight, (2) gives significant weight to an improper or irrele-vant factor, or (3) commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 (internal quotation marks and citation omitted). We will vacate a defendant's sentence as sub-stantively unreasonable only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Goldman*, 953 F.3d 1213, 1222 (11th Cir. 2020) (internal quotation marks omitted).

## B

Based on a criminal history category of II and a total offense level of 31, the district court computed Mr. Lewis' advisory guide-line range at 121 to 151 months. At the sentencing hearing, the government requested a sentence at the high end of the advisory guideline range. The district court agreed and sentenced Mr. Lewis to 151 months of imprisonment.

Before imposing the sentence, however, the district court discussed in great length the §3553(a) factors. It addressed—with much specificity—(1) "the nature and severity of the offense," (2) Mr. Lewis' "history and characteristics," (3) "the need to provide specific deterrence to [Mr. Lewis] and to protect the public from future crimes that he may commit," (4) "the need to provide ade-quate general deterrence," (5) "the need "to promote[] respect for the law and provide[] just punishment for the offense," and (6) "the

need to avoid unwarranted sentencing disparities." *See* D.E. 278 at 87–94.

As relevant here, when discussing the last factor—the need to avoid unwarranted sentencing disparities—the district court considered Mr. Lewis' lack of remorse. It remarked that though one of his co-conspirators, Vanna Clay, had received an immunity deal from the government, that did not necessarily mean that Mr. Lewis should similarly receive a more lenient treatment. *See id.* at 93. Unlike Ms. Clay—who, the district court noted, "accept[ed] responsibility" and "cooperate[d] with the government"—Mr. Lewis had shown "no contrition, no remorse, and no acceptance of responsibility, [or given] any kind of cooperation the way that Ms. Clay provided" to support a sentence "towards the low end of the guideline range." *See id.* In describing Mr. Lewis' lack of remorse the district court further stated:

> Mr. Lewis has shown absolutely no contrition. Mr. Lewis has never apologized to the victims. Mr. Lewis has never accepted responsibility. And Mr. Lewis has done just the opposite. In his repeated and, frankly, frivolous motions to this Court, Mr. Lewis has called the Court a racist . . . has tried to blame everyone else but himself for the victimization that took place in this case . . . [which] shows that Mr. Lewis hasn't accepted responsibility for what he's done, even today.

*Id.* 93–94.

Mr. Lewis' counsel objected to the district court's comments, stating that "Mr. Lewis . . . genuinely maintain[ed] his

innocence," which would explain "his apparent lack of remorse and lack of cooperation." *See id.* at 97. In response, the district court reiterated that it had only considered Mr. Lewis' lack of remorse when weighing the need to avoid unwarranted sentencing disparities:

> [W]ith respect to Mr. Lewis' level of contrition . . . you'll note that I didn't mention any of that in my analysis of the first five 3553(a) factors. I didn't consider that at all in considering the nature and severity of the offense, the history and characteristics of the defendant, the need to provide specific deterrence to the defendant, the need to provide general deterrence to the community, or the need to provide just punishment for the offense, or promote respect for the law . . .My only point was, with respect to disparity in sentencing . . . I find nothing disparate or unfair about the way he's treated, if only because all of the other[] [defendant's convicted of money laundering in this court] have pled guilty and most of them have cooperated . . . And so it's just not fair to treat Mr. Lewis the same as those other people, who, of course, took a plea, got three points off, will get low end or lower, and will get a 5K or Rule 35 for their cooperation against the other people in the scheme. That's not because Mr. Lewis shouldn't be allowed to promote his innocence. It's only to say that those people . . . should receive a significant benefit . . . and that's why I think they're being treated differently than Mr. Lewis.

It was also said in the context of Ms. Clay, who, as I made clear, received a very good deal from the U.S. government . . . [T]here were factors at play in Ms. Clay's case that may have led the government to make that determination, some of which [include,] her acceptance of responsibility, her turning her family members in, and . . . her cooperating against Mr. Lewis . . . None of that is to say that Mr. Lewis doesn't have a right to plead his innocence or to go to trial. It's all in the way of trying to explain why Mr. Lewis is receiving a higher sentence than other money launderers who pled guilty, cooperated, and received a benefit.

*Id.* at 98–99.

## C

Mr. Lewis argues that the district court erred when it considered his lack of remorse when determining his sentence. As a result, it "punished" him for exercising his constitutional right to go to trial by imposing a more severe sentence, at the top of the applicable advisory guideline range. *See* Appellant's Br. at 20–21. But Mr. Lewis is mistaken on the law and misconstrues the record.

First, the district court's consideration of Mr. Lewis' lack of remorse was not improper. Contrary to Mr. Lewis' contention, "[a] district court is permitted to consider lack of remorse in its § 3553(a) analysis as to several factors," including "the characteristics of a defendant, the need to promote respect for the law, and the need to protect society." *United States v. McNair*, 605 F.3d 1152, 1231 (11th Cir. 2010). And we have held that a sentence is not

unreasonable because the district court considers a defendant's lack of remorse—despite the defendant maintaining his innocence—when fashioning a sentence. *See United States v. Mateos*, 623 F.3d 1350, 1367 (11th Cir. 2010). In *Mateos*, for example, we held that "[i]t was reasonable for the district court to consider" a defendant's lack of remorse to differentiate between the defendant's sentence and "those of her coconspirators . . . whom accepted responsibility, pleaded guilty, and cooperated." *Id.* We see no difference in what the district court did here.

Second, the district court made clear at sentencing that it was not considering Mr. Lewis' lack of remorse to penalize him for going to trial. It specifically stated that Mr. Lewis was "allowed to promote his innocence," and that its determination to sentence him at the top end of the advisory guideline range was not because "Mr. Lewis d[idn]'t have a right to plead his innocence or to go to trial," but only to distinguish Mr. Lewis from others who had "pled guilty" and "cooperated" with the government, like Ms. Clay in this case. *See* D.E. 278 at 98–99. Therefore, Mr. Lewis' claim that he was punished for going to trial belies the record.

## IV

We affirm Mr. Lewis' convictions and sentence.

**AFFIRMED.**